# United States Court of Appeals for the Federal Circuit

---

**PETER A. MCMILLAN,**
*Petitioner*

v.

**DEPARTMENT OF JUSTICE,**
*Respondent*

---

2015-3042

---

Petition for review of the Merit Systems Protection Board in No. DC-4324-11-0726-B-1.

---

Decided: February 16, 2016

---

ADAM AUGUSTINE CARTER, The Employment Law Group, P.C., Washington, DC, argued for petitioner. Also represented by R. SCOTT OSWALD.

ANNA BONDURANT ELEY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., FRANKLIN E. WHITE, JR., NATHANAEL YALE; WILLIAM G. HUGHES, Office of Chief Counsel, Drug Enforcement Administration, Springfield, VA.

---

Before NEWMAN, O'MALLEY, and TARANTO, *Circuit Judges.*

O'MALLEY, *Circuit Judge.*

Peter A. McMillan ("McMillan") seeks review of the Merit Systems Protection Board ("the Board" or "MSPB") decision denying his request for corrective action under the Uniformed Services Employment and Reemployment Rights Act of 1994 (codified at 38 U.S.C. §§ 4301–4333) ("USERRA"). *McMillan v. Dep't of Justice*, No. DC-4324-11-0726-B-1, 2014 WL 5423476 (M.S.P.B. Oct. 16, 2014). Specifically, the Board found that McMillan failed to comply with the ordinarily accepted standards of conduct in the course of performing his military duties and was, therefore, not entitled to corrective action under USERRA. For the reasons below, we reverse the decision of the Board and remand for determination of an appropriate remedy.

## BACKGROUND

McMillan was a GS-13 Criminal Investigator with the Drug Enforcement Agency ("DEA"). McMillan also serves as an officer in the United States Army Reserves. On June 24, 2007, he was assigned to the Lima, Peru County Office ("LCO") of the DEA. His tour at LCO was due to expire in 2010, but he requested and was granted a one-year extension. On September 14, 2010, he again requested a tour extension, this time for an additional two years. That request was denied and is the subject of this appeal. McMillan contends that the DEA's decision not to renew his tour was based improperly on his military service in violation of USERRA.

The LCO office in which McMillan worked for the DEA was a relatively small office—"var[ying] in size from [six] to [fourteen] special agents, intelligence analysts, technical personnel, and tactical analysts." Testimony of retired supervisory special agent from DEA James Watson, Trial Tr. 5 ll. 3–16, Jan. 25, 2012. The office was

occupied, in relevant part, by McMillan, Erika Jimenez ("Jimenez"), Juan Arrivillaga ("Arrivillaga"), Michael Walsh ("Walsh"), William Steffick ("Steffick"), and Patrick Stenkamp ("Stenkamp"). McMillan, as a GS-13 Criminal Investigator, had the following chain of command: Arrivillaga was his first-level supervisor; Steffick was his second-level supervisor; and Stenkamp was his third-level supervisor and also the Regional Director. In addition to McMillan's direct line of command, McMillan also interacted with Walsh, who was the Field Intelligence Manager ("FIM") and was outside of McMillan's chain of command. Walsh's first-level supervisor was Steffick and his second level-supervisor was Stenkamp.

McMillan also served in the Army Reserves and was scheduled to complete one week of military service at Southern Command (SOUTHCOM), in Miami, FL, from July 17, 2010 through July 26, 2010. As part of his military service, McMillan was assigned to write a "two to three page intelligence assessment on the historical impact of the DEA's expulsion from Bolivia on drug trafficking, public corruption and social effects." Pet'r Br. 5. In particular, McMillan was instructed by his military supervisors to create an "Intel Assessment on how DEA's expulsion from [Bolivia] has affected drug trafficking in [Bolivia], with additional discussion on any political (corruption), or societal effects," and to use his "DEA expertise" to "look[] at a couple other products" during his week at SOUTHCOM. Joint Appendix ("J.A.") 630.

In light of this, McMillan approached the LCO FIM, Walsh, to take advantage of his unique expertise on the DEA's interaction with Bolivia. Walsh had been FIM with the DEA for over six years, had worked with the DEA for over twenty-three years, and, most importantly, was previously stationed in Bolivia. *See id.* at 650 ll. 6–21.

In response to McMillan's request for assistance, Walsh suggested he use a Foreign Situation Report ("FSR") on Bolivia. *See id.* at 652 l. 19–653 l. 1. The FSR is a summary of the intelligence DEA has on a particular country. *See id.* at 664 ll. 11–18. Directly following this discussion, Walsh and McMillan walked down the hall to Stenkamp's office to seek permission to release information from the FSR outside of DEA to McMillan's military supervisors. *See id.* at 653 l. 18–654 l. 7. Stenkamp gave his approval for McMillan to use and cite the FSR. *Id.* at 15. McMillan testified that he "left that office with the understanding that . . . [he] had permission to use the FSR as a citation or a source document for the two to three-page situational awareness brief for interagency benefit." *Id.* at 701 ll. 9–21.[1]

Thereafter, McMillan prepared his report and went to Miami to fulfill his military service obligations. While there, two email exchanges took place between McMillan, Walsh, Arrivillaga, Steffick, and Stenkamp. The first concerned the use of the FSR in the military intelligence report, and the second related to McMillan's ability to participate in a secure video teleconference ("SVTC") regarding the potential ejection of the Military Assistance Group from Bolivia. *See id.* at 703 ll. 16–21.

On the morning of Monday, July 19, 2010, McMillan first reached out to Walsh, simply attaching a draft of the

---

[1]    Stenkamp testified that he did not recall providing his approval for use of the FSR, *see* J.A. 227 ll. 4–12, but was aware that McMillan wanted to use DEA resources, including the FSR, to fulfill his military service obligations, *see id.* at ll. 13–16. Walsh, however, agreed with the statement that "Mr. Stenkamp hesitantly agreed to allow [McMillan] to use [the FSR] with the caveat that the DEA would be reviewing his report." *Id.* at 70 ll. 9–12.

"Bolivia Intelligence Assessment" he had prepared. *Id.* at 922–23. That same morning, Walsh responded with various edits, commenting: "Nice report." *Id.* at 922. McMillan replied, thanking Walsh for his review. *Id.* at 921–22. He also articulated his belief that his work with the military is a "force multiplier for Lima CO." *Id.* at 922. He stated, moreover, that, while he was aware that there are "official channels," which he "[wa]s not trying to circumvent," he did "want to supplement them." *Id.*

The next day, on Tuesday, July 20, McMillan began a discussion regarding his participation in the SVTC, at the request of his military supervisors. McMillan wrote to Walsh to inform him that he would be "represent[ing] SOUTHCOM J2 in a SVTC with members of the Pentagon's Joint Staff" and that he "would appreciate it if [Walsh] would advise RD Stenkamp" that he would "appreciate [Stenkamp's and Walsh's] perspective, guidance and expertise." *Id.* at 962. McMillan further noted that he believed his "dual capacity as a MI Reservist and 'working' agent," allowed him "to be a proponent for DEA's viewpoint in the Southern Cone." *Id.* This email was forwarded to Stenkamp and Steffick. Stenkamp did not approve of this. He wrote to McMillan:

> No. No. No. First, did you run this through your chain? The answer is no, you did not. Second, you are NOT to represent yourself in this meeting as associated with DEA. If DEA is to be respresented, [sic] it will be done at another level. In all due respect, you are not qualified to weigh in on Bolivia. The evidence of that is you are asking for my opinion, expertise and guidance. My opinion, expertise and guidance tell me that you may do more harm than good. I can not prohibit your participation in the SVTC, but you are to do so only in your capacity with the military. End of story – period.

*Id.* at 961–62. In response, McMillan sent a seven-paragraph email in which he, among other things, "respectfully, [took] issue with [Stenkamp's] characterization of [his] qualification to weigh in on a given topic" and noted that he found "offensive" Stenkamp's remark that he "may do more harm than good." *Id.* at 960. This email appears to be central to the government's argument that McMillan acted outside the bounds of ordinarily accepted standards of conduct.

The Administrative Judge ("AJ"), in its opinion after the remand, characterized this email, saying that McMillan "set forth his qualifications as though he were applying for a position and stating he would compare it to anyone in the DEA." *Id.* at 22 (citations omitted). The AJ continued, finding that McMillan "further stated that he sought Stenkamp's input as a sign of respect and 'to make [him] aware of events that may interest [him].'" *Id.* (citations omitted). The AJ "found the appellant's tone and the content of the email to be condescending and improper coming from a line agent to his third line supervisor and the Regional Director." *Id.* In its Final Opinion, the Board stated that it "agree[d] with the administrative judge that the appellant's July 20, 2012 email to [Stenkamp] was disrespectful in tone and content." *Id.* at 6.

Stenkamp replied the next morning, on Wednesday, July 21, to McMillan's email with: "You are not authorized to represent DEA policy or positions in this meeting. Period!!!!! Take all the issue you want." *Id.* at 960. This ended the conversation regarding McMillan's participation in the SVTC as a representative of DEA. McMillan still had yet to receive final sign-off on his intelligence report to the military, however.

Later that same day, Wednesday, July 21, Stenkamp conveyed edits he made to the intelligence report to McMillan through Walsh, asking McMillan to remove

certain sensitive information. *Id.* at 921. McMillan complied with the request and asked whether there was "anything else that needs to be modified or removed." *Id.* McMillan and Walsh engaged in two additional rounds of edits to the report. McMillan then, apparently for the first time, looped in his first-level supervisor Arrivillaga. *Id.* Walsh continued the conversation with McMillan and Arrivillaga, noting that the report "[l]ooks okay to" him and that the "RD [Stenkamp] is reviewing it now" but "wants to verify" that certain information was publicly available. *Id.* at 919. After McMillan responded to that concern, Walsh further indicated that Stenkamp was "off to a meeting, [but] will re-visit [the report] when he returns." *Id.*

Upon his return, Stenkamp conveyed to Walsh that he wanted all reference to the FSR removed. Walsh wrote to McMillan and Arrivillaga: "Sorry, but RD Stenkamp wants all references to the FSR to be removed from the report." *Id.* at 918. McMillan replied:

> If I remove all references to the FSR then the majority of the document cannot be substantiated and therefore cannot be produced. That will require me to begin researching alternative classified and unclassified materials to produce the same product which is illogical. DEA is a member of the intelligence community. There is no logical reason not to cite the FSR.

*Id.* Walsh's response conveyed a message from McMillan's second-level supervisor Steffick: "[I]t was a direct order from the Regional Director, and it is to be followed; no further discussion required. Is this clear?" *Id.* McMillan complied. Indeed, there is no contention that McMillan failed to follow any directive given by his DEA supervisors during his military service.

McMillan returned to LCO from his military duties on July 25, 2010. The next day, Arrivillaga sent McMillan a

Memorandum on "Issues Regarding Chain of Command, DEA Representation with US Military Entities, and Email to Southern Cone Regional Director." *Id.* at 924–25. The memo "establish[ed] clear and precise guidelines from Lima Country Office management in light of recent issues." *Id.* It addressed "some misunderstanding as to [McMillan's] role as a DEA GS-13 and [his] role as a Major in the US Army." *Id.* Of particular importance, the memorandum stated:

> In order to prevent any further misunderstanding, *from the date of the receipt of this memorandum*, in addition to explicit orders from the Regional Director, you are not to represent in any way or fashion anything associated with your duties or work product as a result of your employment with the DEA to your military colleagues. Your specific role as a GS-13 in the DEA and how you represent this role outside of this agency will be determined by the LCO chain of command. Should your colleagues in the military have a specific question or request because of your employment with the DEA, you are hereby instructed to refer them to our DEA liaison GS-15 representative at SOUTHCOM . . . . Any work product that you produce for the military must be authored by you under your military status and rank and not associated in any way or be attributed to your employment status with the DEA. If in the future there are any questions that arise, please refer back to this memorandum for guidance.

*Id.* (emphasis added).

On September 14, 2010, less than two months after McMillan's military service, McMillan submitted a request for a two-year tour extension. *Id.* at 710 ll. 12–14. This request was rejected the next day. *Id.* at 330 ll. 7–10; 710 l. 20–711 l. 5.

McMillan filed a complaint in November 2010 with the Department of Labor's Veterans' Employment and Training Service ("VETS"), complaining that the Agency's actions violated USERRA. After that claim was investigated and found unsupported, McMillan appealed that decision to the Board on June 21, 2011. On February 15, 2012, an AJ issued the first Initial Decision of the MSPB. *See* J.A. 614–625. The AJ found:

> [T]he record contains no evidence that the appellant's status or obligations as a military reservist played any part whatsoever in the agency's decision to disapprove his request for a 2-year renewal of his tour of duty in Lima, Peru. The appellant's request for corrective action under USERRA therefore must be denied.

*Id.* at 624–25. On March 21, 2012, McMillan petitioned the MSPB for review. The MSPB granted McMillan's petition on July 16, 2013, and vacated the AJ's Initial Decision, remanding the case for further proceedings. *Id.* at 628–643. In particular, the Board found that, "to the extent an employee's military duties are themselves at odds with the interests of the civilian employer, the employer may not take action against the employee on that basis" and "remand[ed] the appeal to provide the parties an opportunity to present additional evidence and argument in light of [its] holding." *Id.* at 638–39.

On December 17, 2013, on remand, an AJ held an additional hearing to resolve the issues identified by the Board in its remand order, leading to a second Initial Decision, dated January 31, 2014. In that decision, the AJ resolved each issue against McMillan and denied his request for corrective action. *Id.* at 8–28. In particular, the AJ found that McMillan's military duties were not a motivation for the denial of his request for a tour extension. Instead, the AJ identified three motivations for the denial of McMillan's request: McMillan's "performance

issues," which are considered in terms of the number of arrests, seizures, informant recruitment, and disruptions of criminal organizations McMillan facilitated, *id.* at 19–20; McMillan's alleged failure to follow his chain of command in soliciting assistance with his military assignment, *id.* at 14–19; and McMillan's "disdain[ful]," "arroga[nt], "disrespectful and improper" emails to his supervisor, Stenkamp, *id.* at 19, 22.

After McMillan petitioned the Board for review of the second Initial Decision on March 7, 2014, the Board issued its final decision denying McMillan's request for corrective action on October 16, 2014. *Id.* at 1–7. This appeal followed.

STANDARD OF REVIEW

On appeal, a final order or decision from the MSPB must be upheld unless we find that it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c).

Underlying factual determinations are reviewed for substantial evidence. *Bolton v. Merit Sys. Prot. Bd.*, 154 F.3d 1313, 1316 (Fed. Cir. 1998); *see also Parker v. U.S. Postal Serv.*, 819 F.2d 1113, 1115 (Fed. Cir. 1987) (The correct "standard is not what the court would decide in a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole."). This Court "will not overturn an agency decision if it is supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hogan v. Dep't of Navy*, 218 F.3d 1361, 1364 (Fed. Cir. 2000) (internal quotation marks omitted) (quoting *Brewer v. U.S. Postal Serv.*, 647 F.2d 1093, 1096 (Ct. Cl. 1981)). "It is not for this court to reweigh the evidence before the Board." *Henry v. Dep't of*

*Navy*, 902 F.2d 949, 951 (Fed. Cir. 1990). We have juris-diction to review the final order of the MSPB pursuant to 28 U.S.C. § 1295(a)(9).

## DISCUSSION

Resolution of McMillan's appeal turns on this court's interpretation of USERRA, the purpose of which is, among other things, "to prohibit discrimination against persons because of their service in the uniformed ser-vices." *See* 38 U.S.C. § 4301(a)(3). The operative provi-sion in this case is 38 U.S.C. § 4311, which provides, *inter alia*, that, "[a] person who . . . has an obligation to per-form service in a uniformed service shall not be de-nied . . . any benefit of employment by an employer on the basis of . . . performance of service." § 4311(a). And, further, that:

> (c) An employer shall be considered to have en-gaged in actions prohibited—
>
> > (1) under subsection (a), if the person's membership, application for membership, service, application for service, or obliga-tion for service in the uniformed services is a motivating factor in the employer's ac-tion, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

§ 4311(c)(1).

In *Sheehan v. Dep't of Navy*, 240 F.3d 1009 (Fed. Cir. 2001), this court articulated the analysis the Board must employ in a USERRA case. In *Sheehan* we held that, "an employee making a USERRA claim of discrimina-tion . . . bear[s] the initial burden of showing by a prepon-derance of the evidence that the employee's military service was 'a substantial or motivating factor' in the

adverse employment action." *Id.* at 1013. Once the employee has made the requisite showing, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Id.* Notably, however, "an employer can not treat employees on military duty like those on non-military leave of absence." *Erickson v. U.S. Postal Serv.*, 571 F.3d 1364, 1369 (Fed. Cir. 2009) (internal quotation marks omitted) (quoting *Allen v. U.S. Postal Serv.*, 142 F.3d 1444, 1447 (Fed. Cir. 1998)).

"The factual question of discriminatory motivation or intent may be proven by either direct or circumstantial evidence." *Sheehan*, 240 F.3d at 1014. As we have explained, "military service is a motivating factor for an adverse employment action if the employer 'relied on, took into account, considered, or conditioned its decision' on the employee's military-related absence or obligation." *Erickson*, 571 F.3d at 1368 (quoting *Petty v. Metro. Gov't of Nashville–Davidson Cty.*, 538 F.3d 431, 446 (6th Cir. 2008)). Because employers rarely concede an improper motivation for their employment actions, we recognized in *Sheehan* that employees may satisfy their burden to establish that their military service or obligation was a motive in the challenged action by submitting evidence from which such a motive may be fairly inferred. *Sheehan* describes four, non-exclusive factors that should help the Board determine whether a discriminatory motivation may be reasonably inferred in any given USERRA challenge:

> Discriminatory motivation under the USERRA may be reasonably inferred from a variety of factors, including [1] proximity in time between the employee's military activity and the adverse employment action, [2] inconsistencies between the proffered reason and other actions of the employer, [3] an employer's expressed hostility towards

members protected by the statute together with knowledge of the employee's military activity, and [4] disparate treatment of certain employees compared to other employees with similar work records or offenses.

240 F.3d at 1014 (numbering added).

Much, therefore, hinges on whether the testimony before the Board was sufficient to allow a reasonable inference that the adverse employment action at issue was discriminatory under USERRA. If McMillan demonstrated by a preponderance of the evidence that his military service was "a substantial or motivating factor" in the denial of his request for a tour extension, *id.* at 1013, the Board must shift the burden to the government to demonstrate, also by a preponderance of the evidence, that the adverse employment action would have taken place for a valid reason.

## A. The *Sheehan* Factors

The Board never formally shifted the burden to the government because it concluded that McMillan failed to meet his initial burden of showing by a preponderance of the evidence that his military service and obligations were relied on, taken into account, or considered in the adverse employment action. Whether a petitioner's military service was a motivating factor in the employment decision is a flexible inquiry. We conclude that the evidence permits only one reasonable finding: the evidence establishes the presence of all four of the *Sheehan* factors, which together demonstrate that McMillan satisfied his burden.

### 1. Timing of the Adverse Action

The first factor discussed in *Sheehan* is the "proximity in time between the employee's military activity and the adverse employment action." *Id.* at 1014. McMillan approached Walsh on July 7, 2010 for assistance with

completing his military obligation, J.A. 62 ll. 17–21, to produce an "Intel Assessment," *id.* at 630. McMillan's military leave was from July 17 through July 26, 2010. *Id.* at 631. The email communications that gave rise to the adverse employment action, *id.* at 918–23, 960–62, are dated between July 19 and July 22, 2010, during McMillan's military leave. Upon his return to the DEA, McMillan was presented with a disciplinary memorandum on July 26, 2010, which "establish[ed] clear and precise guidelines from Lima Country Office management in light of recent issues regarding" McMillan. *Id.* at 924–25. And, while McMillan had received an overall "Outstanding" performance rating in 2008, *id.* at 874, and 2009, *id.* at 888, he received a "Significantly Exceeds Expectations" rating in October 2010, *id.* at 903—a downgrade—after he took his military leave.[2]

McMillan requested a tour extension on September 14, 2010, *less than two months after his military leave. Id.* at 19. It was denied the next day on September 15, 2010. *Id.* at 19–20. The timing of the adverse action, therefore, favors McMillan's claim that there was discriminatory motivation in violation of USERRA.

### 2. Inconsistencies Between the Employer's Reasons and Actions

The second *Sheehan* factor looks to the "inconsistencies between the proffered reason and other actions of the employer." 240 F.3d at 1014. The AJ identified three reasons for the denial of McMillan's request for a tour extension, each of which is at least somewhat inconsistent

---

[2]    The four-tiered rating system, in descending order, is: "Outstanding," "Significantly Exceeds Expectations," "Acceptable," and "Unacceptable." *See, e.g.*, J.A. 915.

with DEA's other actions and explanations for its treatment of McMillan.

First, the AJ pointed to "performance issues," which are considered in terms of the number of arrests, seizures, informant recruitment, and disruptions of criminal organizations facilitated by McMillan. J.A. 19–20. Second, it found that McMillan failed to follow his chain of command in soliciting assistance with his military assignment. *Id.* at 14–19. Third, it found that McMillan's email to Stenkamp was "disrespectful and improper" and "arroga[nt]." *Id.* at 19, 22. We find inconsistencies with respect to each of these reasons, making reliance on them questionable.

#### i. Performance Issues

First, McMillan's alleged "performance issues" do not appear to be a factor upon which the DEA actually based its decision not to renew his tour extension request. The AJ found that "Arrivillaga told [McMillan] of management's decision on September 15, 2010, and informed the appellant that his performance with respect to seizures, arrests and informant recruitment were not at expected levels." *Id.* at 19–20.

But on October 6, 2010, McMillan was given an overall rating of "Significantly Exceeds Expectations." *Id.* at 903. In 2009, the year prior, he received the rating of "Outstanding." Accompanying that rating, management penned a narrative under "Performance Accomplishments," explaining why it believed McMillan was functioning at a high level. *Id.* at 900. The narrative noted that McMillan, among other things, "has been at the forefront of complex money laundering investigations," has "develop[ed] in-roads to the . . . Money Laundering Investigations Division" that "proved critical to successfully dismantling" a priority target organization and an infamous individual, resulting "in the seizure of over $200 million in tangible assets and severely damaged the drug

industry export flow" using "new and innovative under-cover money laundering techniques." *Id.* No reference to seizures, arrests or an identified number of informants appeared in that narrative. There was no narrative at all in McMillan's 2010 performance review. Thus, there is nothing explaining the new rating decisions, pointing to any specific performance failures, or indicating that McMillan's prior positive activities had ceased. Stenkamp's testimony below indicated that—from his perspective—the reason for the drop in McMillan's ratings from 2009 to 2010 was based less on the number of seizures and arrests and more on "a failure to engage with management." *Id.* at 237 ll. 5–11.

Furthermore, it is undisputed that "there were never any metrics or statistics established at the LCO for McMillan in particular, or for an agent seeking a tour extension more generally." Pet'r Br. 16. Jimenez, an agent previously assigned to LCO, also testified at McMillan's hearings in front of the Board. When asked: "None of your DEA managers in Lima, Peru informed you that in order to have an agent's tour extended that the agent needed to demonstrate any particular level of performance, correct?," she responded: "Not that I recall, no. I don't believe I was ever told that." J.A. 88 ll. 6–11. McMillan testified that he believed that he needed to be rated "acceptable" in order to have his tour extension request approved. *Id.* at 714 ll. 8–14. To the extent, therefore, that McMillan actually fell short of management's expectations, that shortcoming was never reflected in any documentation related to his performance rating. And, to the extent the DEA relies on McMillan's performance metrics to demonstrate that his tour extension request was properly denied, there is no evidence that that policy was ever made known to McMillan or similarly situated agents.

ii. Chain of Command

The Board found that McMillan "was required to follow the agency chain of command in soliciting assistance with his military assignment" and that "he was . . . obliged to proceed through his own chain of command prior to approaching [Stenkamp] for approval to use the FSR." *Id.* at 3, 4.

Yet the government does not dispute that, when McMillan approached Walsh to ask for help on his military assignment, there was an "open-door" policy in place for the office. Jimenez testified as follows:

> Q: The type of environment and [sic] you and Mr. McMillan worked in in Peru was one where an agent could freely move around and ask people for help, including other – his supervisors and other employees at the DEA, correct?
>
> A: Yes, sir. It's a very small office.
>
> Q: And the supervisors there had open door policies about helping one another.
>
> A: I – I think so, yes. That's correct.
>
> Q: And it was a cooperative environment.
>
> A: Yes.

*Id.* at 91 ll. 4–14. Similarly, Walsh testified that there was nothing at all unusual about McMillan approaching him for help on this project. *See id.* at 652 ll. 15–18 ("Q: And so there was nothing inappropriate about Mr. McMillan approaching you at all; is that right? A: That's right."). This testimony directly contradicts Stenkamp's testimony that McMillan broke the chain of command when he approached Walsh. Stenkamp testified that "[McMillan] went straight to Mike Walsh, and he knows that's not the chain or I submit he should have known that that was not the chain, the proper chain of command.

It doesn't matter if it's an intelligence function. He did not report to Mike Walsh." *Id.* at 231 ll. 14–19.

On this issue, the Board found that, "even if the appellant had acted within the bounds of the agency's open door policy when he first approached [Walsh], he was nonetheless obliged to proceed through his own chain of command prior to approaching [Stenkamp] for approval to use the FSR." *Id.* at 4. This conclusion suffers from three inconsistencies: first, it was Walsh who walked McMillan down the hall to see Stenkamp and seek approval for the use of the FSR—*see* Pet'r Br. 19 (Walsh "took McMillan down the hall to obtain permission to use the DEA source material"); second, "clear and precise guidelines" regarding the "[c]hain of [c]ommand, DEA [r]epresentation with US [m]ilitary [e]ntities, and [e]mail to Southern Cone Regional Director" had yet to be formally established, J.A. 924; and third, as discussed in more detail below, Walsh violated his own chain of command when he took McMillan directly to Stenkamp but was never criticized for that.

As previously discussed, when McMillan returned from his military leave, he was presented with a memorandum from his first-level supervisor Arrivillaga, which "establish[ed] clear and precise guidelines from Lima Country Office management in light of recent issues." J.A. 924–25. But, that memorandum established concrete policies "from the date of [its] receipt." *Id.* One policy established by that memorandum is that "[a]ny work product that [McMillan] produce[s] for the military must be authored by [McMillan] under [his] military status and rank and not associated in any way or be attributed to [his] employment status with the DEA." *Id.* The memorandum implies that no clear policy was in place before the date of its receipt. It is entirely inconsistent for DEA to take an adverse employment action based on McMillan's alleged failure to comply with a policy created after the occurrence of the complained-of actions. Indeed, Stenkamp did not even know what the precise chain of

command in the office was, indicating further its lack of strict enforcement prior to this incident. *See id.* at 820 ll. 3–16 (Q: And nor did you raise [issues regarding the chain of command] with Mr. Walsh, Mr. Walsh approaching you directly about this matter either? A: I did not because Mike Walsh reported directly to me. Q: No, he didn't. He reported to Mr. Steffick. A: No. Mike Walsh reported directly to the regional director. Q: So if Mr. Walsh testified that his supervisor was Mr. Steffick, is he being untruthful or just wrong? A: I think he's wrong. My recollection is that Mike Walsh reported directly to me.").

We do not question the fact that the chain of command is "need[ed] and importan[t]." *Id.* at 19. This is especially true where the civilian setting is a law enforcement agency. The Board failed, however, to address the fact that the policy was explicitly defined to cover McMillan's situation only *after* the complained-of actions. Although the Respondent notes that "Mr. Walsh was not in Mr. McMillan's chain of command, and Mr. McMillan failed to contact Mr. Arrivillaga his first-level supervisor" before contacting Walsh, Resp't Br. 3, Walsh obviously did not believe McMillan did anything wrong and clearly did not believe he needed to bring his own immediate supervisor into the dialogue regarding McMillan's military project.

Finally, McMillan did not approach Walsh as a civilian. The Board makes much of the fact that McMillan was acting in a "dual capacity" and that he was "in his civilian position" when he approached Walsh for help. *Id.* This is because McMillan did not "contest the administrative judge's finding that he would be required to go through the chain of command if he were (1) acting in his capacity as a [DEA] agent, and (2) seeking to disseminate DEA information outside the agency." J.A. 3. McMillan was not acting in his capacity as a DEA agent, however. Both Walsh and Stenkamp were keenly aware that

McMillan was approaching them for assistance with a military project, assigned to him in his military capacity.[3]

---

[3]    Walsh testified as follows:

Q: In the early part of July 2010, my client, Mr. McMillan approached you to tell you about an assignment that he had received in his capacity as a military intelligence officer; is that correct?

A: Yes.

Q: And he told you at that time that it was to be an intelligence assessment concerning Bolivia; is that correct?

A: That's correct.

Q: And did you understand that Mr. McMillan was asking you that – for that question or for that help in his capacity as a – or on behalf of the military?

A: Yes.

Q: Indeed it was in preparation for his ongoing military assignment?

A: That's right.

*Id.* at 651 l. 19–652 l. 14.  Stenkamp was similarly aware of the military nature of the request.  And, although he was unable to recall that McMillan personally asked him for permission to use the FSR outside of DEA, he did recall that the resources he discussed with Walsh in July, 2010 were to be used externally by McMillan in his role with the military:

Q: Okay.  On or about July 7th, 2010 Mr. McMillan came to you along with Mr. Walsh to ask about using background material on Bolivia for a

Further compounding the inconsistencies between the proffered reason—breaking the chain of command—and the adverse employment action, Stenkamp testified that McMillan's alleged breaking the chain of command was not even the reason he did not concur with McMillan's request to renew his tour:

Q: Is the fact that appellant did not follow the chain of command the only reason why you did not concur with his request to renew his tour?

A: It was a – it was symptomatic of the reasons why I did not concur with the renewal of his tour. It was not per se a reason that was specific. Had he followed the chain of command 100 percent in this particular instance that we're talking about, I still would not have renewed his tour.

Q: And why would you still not have concurred with his request?

A: For several reasons. . . . They did not appear to be investigations that merited a GS-13. I didn't

military intelligence assignment that he had, correct?

A: I don't recall that Pete McMillan actually came to me. I recall that Mike Walsh came to me.

Q: You don't recall the two of them standing in your office talking about this assignment?

A: I do not.

Q: Okay. You were aware though that Mr. McMillan desired to use DEA resources and this background report in his role as a military Reservist.

A: I was.

*Id.* at 227 ll. 4–16.

> think that he meshed with the team notion that I
> was trying to cultivate there in Lima.  He was a
> lone wolf, liked to do his own thing, wasn't intui-
> tive of the many reasons.

*Id.* at 814 l. 19–815 l. 20.  The Board's reliance on McMil-
lan's breaking the chain of command in using the FSR in
his military report is unsupported by and, in fact, contra-
dicted by the record: the evidence of an open door policy in
the office, the after-the-fact establishment of an explicit
chain of command policy, the apparent disregard of the
chain of command by others, and Stenkamp's testimony
that McMillan's alleged breaking the chain of command
did not influence his decision.

### iii.  McMillan's Tone

McMillan's personality and tone through his commu-
nications are a third reason given for his dismissal.  The
Board found that McMillan "fail[ed] to comply with the
ordinarily accepted standards of conduct in the course of
performing his military duties."  *Id.* at 6; *see Figueroa
Reyes v. Hosp. San Pablo del Este*, 389 F. Supp. 2d 205,
212 (D.P.R. 2005) ("The protection of a veteran's employ-
ment is, therefore, 'based upon the veteran's compliance
with the reasonable and ordinarily accepted standards of
personal conduct and performance of all employees.'")
(quoting *Preda v. Nissho Iwai Am. Corp.*, 128 F.3d 789,
792 (2d Cir. 1997))).

In finding that he failed to comply with "reasonable
and ordinarily accepted standards of personal conduct
and performance applicable to all employees," the AJ
noted that, in his emails, "the appellant's reaction and
responses to his manager's instructions were not within
the ordinarily accepted standards of personal conduct."
J.A. 21.  Reliance on the content and tone of McMillan's
email responses as a basis for the denial of his tour re-
newal request, however, is inconsistent with the employ-
er's other actions, including emails sent from McMillan's

third-line supervisor and Regional Director Stenkamp that appear equally, if not more, out of keeping with "ordinarily accepted standards of personal conduct." The email exchanges must be construed in context.

The first email mentioned by the Board was what the Board characterized as McMillan's "seven paragraph email in which he set forth his qualifications as though he were applying for a position," which the Board said "make[s] clear his arrogance and opinion that he was not required to follow his chain of command or even consult with them." *Id.* at 22. The Board "found the appellant's tone and the content of the email to be condescending and improper coming from a line agent to his third line supervisor and the Regional Director." *Id.* We find the Board's characterization of this email unsupportable.

First, the email must be construed in context. McMillan's first email in this chain was respectful and informative. He simply noted to Walsh that he would be "represent[ing] SOUTHCOM J2 in a SVTC with members of the Pentagon's Joint Staff" and that he "would appreciate it if [Walsh] would advise RD Stenkamp" that he would "appreciate [Stenkamp's and Walsh's] perspective, guidance and expertise." *Id.* at 962. He appears proud of his military assignment and its relation to his civilian position and seeks input from his civilian supervisors. *Id.* This is consistent with the orders he received from his military supervisor, in which McMillan was informed that he was expected to use his "DEA expertise" to help with "other projects" while at SOUTHCOM. *Id.* at 630.

Walsh forwarded this email to Stenkamp and Steffick, merely stating, "FYI." *Id.* Stenkamp's response then changed the tone from one of respect to one of derision. Stenkamp wrote, "No. No. No." *Id.* at 961–62. He told McMillan that he was "not qualified to weigh in on Bolivia" and, as evidence for that proposition, he pointed to the fact that McMillan was "asking [Stenkamp] for [his]

opinion, expertise and guidance." *Id.* McMillan's request for guidance from his superior caused a seemingly unprovoked backlash.

McMillan saw an opportunity to capitalize on his particular position and connections at DEA to better fulfill his military obligations. He sought to use the FSR in his intelligence report, as Walsh suggested he do. It was only after Stenkamp realized the military was viewing McMillan as a possible spokesperson for the DEA that Stenkamp pulled the plug on the use of the FSR.

The second email exchange with which the Board took issue was one in which McMillan characterized the belated decision to forbid use of the FSR and require McMillan to prepare a new report as "illogical." *Id.* at 22. That email was sent the day after the exchange relating to McMillan's participation in the SVTC. At that point, McMillan had approval for use of the FSR for over two weeks, Walsh had been in contact with McMillan on edits to the intelligence report that referenced the FSR, and Stenkamp himself had read the report and provided feedback that did not require removing reference to the FSR. McMillan complied with all edits up to that point without complaint. Then Walsh gave McMillan the bad news: "Sorry, but RD Stenkamp wants all references to the FSR to be removed from the report." *Id.* at 918. Clearly, Walsh knew this was information likely to upset McMillan or, at minimum, upend his reasonable expectation that the FSR was an appropriate source upon which to rely. On July 21, 2010, halfway through his military leave, he had to redo his report. His email demonstrates his understandable frustration. It is also hard to understand how the AJ could characterize the email as one in which McMillan called his third-line supervisor "illogical." *Id.* at 22. On its face, the email simply refers to McMillan's need to rewrite the report from scratch as "illogical." *See id.* at 918.

The content and tone of McMillan's responses to his supervisors were, to be sure, not ideal. But they were not unprompted and not as inappropriate as the Board's strained characterization of them indicates. They cannot, without more, explain the motivation for the decision not to renew his tour.

### 3. Expressed Hostility

The third *Sheehan* factor that may lead to an inference of discriminatory motivation is the "expressed hostility towards members protected by the statute together with knowledge of the employee's military activity." 240 F.3d at 1014. While the Board made no finding one way or the other, Stenkamp's emails to McMillan ordering him not to represent DEA during the SVTC cannot be reasonably construed as anything but hostile to McMillan's military assignment. *See* J.A. 960, 961–62. While Stenkamp may not have been hostile to McMillan's need to do his military service, he certainly was hostile to McMillan's military obligations once he focused on what those obligations entailed.

### 4. Disparate Treatment of Other Employees

The fourth factor discussed in *Sheehan* as indicative of discriminatory motivation is the "disparate treatment of certain employees compared to other employees with similar work records or offenses." 240 F.3d at 1014. McMillan points to the DEA's treatment of Walsh as evidence that non-military employees were treated differently. In particular, McMillan alleges:

> Walsh admittedly, went around his own chain-of-command (bypassing Steffick) by going directly to Stenkamp on July 7. Walsh's supervisor, Steffick testified that by approaching Stenkamp directly, without first clearing his question through Steffick, Walsh broke his chain-of-command. Despite Walsh breaking chain-of-command, Walsh was

never disciplined. Walsh, who is not covered by USERRA, also had all of his tours renewed in the LCO.

Pet'r Br. 9 (citations omitted). As Steffick explained:

Q: All right. Let's go back to July 7th and I'll represent to you the testimony has been that Mr. McMillan approached Mr. Walsh for some help on his research assignment. Mr. Walsh mentioned the FSR and Mr. Walsh said, "But before it can be released outside of DEA, we've got to go down and get Mr. Stenkamp's authority," and that they walked down to Mr. Stenkamp's office to get his approval. That's the wind up. Here's the pitch. Did you – do you believe that if those are the facts, that Mr. Walsh, as your supervisee, had an obligation to take this matter through you?

A: Yes, I do.

Q: Okay. Did he get disciplined for breaking the chain of command?

A: No, he did not.

J.A. 799 l. 18–800 l. 12.

DEA points out that it was McMillan, and not Walsh, who was "the individual taking DEA resources and using them outside the agency." Resp't Br. 28. This is certainly an important distinction as the dissemination of confidential information outside the organization requires more scrutiny than use of that same information for internal purposes. But Walsh understood that McMillan's intention was to use the information being sought for military purposes. So did Stenkamp. *See* J.A. 651 l. 19–652 l. 14, 227 ll. 4–16. That McMillan was the individual who ultimately sought to rely on the confidential information in his military report does not absolve Walsh of his responsibility to go through his chain of command before

supplying McMillan with the confidential document, knowing of McMillan's purpose in acquiring the document. Yet Walsh was never the subject of any adverse employment action, while McMillan was.

\* \* \*

All of this evidence gives rise to a fair inference that McMillan's obligation to prepare a report on DEA's ouster from Bolivia while on military duty was a motivation for the denial of his tour extension. As the Board noted in its remand following McMillan's initial appeal, McMillan requested a written explanation for the denial of his request, but LCO command curtly refused to provide any. *Id.* at 633. The Board's after-the-fact effort to now provide an explanation of the DEA's motivations is fraught with too many overstatements and inconsistencies to offset the inference that the actual motivation was an improper one under USERRA.

While, in hindsight, it perhaps would have been better if the military had not ordered McMillan to prepare a report relating to the DEA and Bolivia, it did. While Walsh and Stenkamp may wish, also in hindsight, that they did not agree to help with that report, they did. Under USERRA, McMillan may not be punished for fulfilling his military obligations.

## B. The Government's Burden

We thus conclude that McMillan carried his burden to demonstrate by a preponderance of the evidence that the employee's veteran status was "a substantial or motivating factor for an adverse employment action." *Erickson*, 571 F.3d at 1368. Because the Board did not find that McMillan successfully carried his burden, it never shifted the burden to the DEA. Because McMillan has made the requisite showing, "the [DEA] then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the

adverse action anyway, for a valid reason." *Sheehan*, 240 F.3d at 1013. At oral argument, attorneys for both parties agreed that, if this court were to find that McMillan carried his burden, no remand is necessary to provide the government with an additional opportunity to meet its burden. Oral Arg. at 6:21–8:31; 25:38–26:16, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 15-3042.mp3. As such, we rely on the evidence of record, as the parties have invited us to do.

We must determine, therefore, whether DEA adduced evidence sufficient to prove by a preponderance of the evidence that it would have denied McMillan's request for a tour renewal despite the protected activity. The first step is defining what activity was protected.

In *Erickson*, this court applied the "substantial or motivating factor" analysis from *Sheehan*. *Erickson v. U.S. Postal Serv.*, 571 F.3d 1364 (Fed. Cir. 2009). There, a Postal Service employee was absent from his position for almost five years during his service in the National Guard. The Postal Service removed Mr. Erickson from his position, noting as its reason "his excessive use of military leave." *Id.* at 1368. The court noted that:

> [a]n employer cannot escape liability under USERRA by claiming that it was merely discriminating against an employee on the basis of his absence when that absence was for military service. As other courts have held, military service is a motivating factor for an adverse employment action if the employer "relied on, took into account, considered, or conditioned its decision" on the employee's military-related absence or obligation.

571 F.3d at 1368 (quoting *Petty*, 538 F.3d at 446). Indeed, "the overarching goal of [USERRA] is to prevent those who serve in the uniformed services from being disadvantaged by virtue of performing their military obligations." *Id.*

The Postal Service is "entitled to remove an employee for prolonged *nonmilitary* leaves of absence." *Id.* at 1369 (emphasis added). But "an employer can not treat employees on military duty like those on non-military leave of absence." *Id.* (internal quotation marks omitted) (quoting *Allen*, 142 F.3d at 1447). "Congress enacted USERRA in part to make clear that discrimination in employment occurs when a person's military service is 'a motivating factor,' and not to require . . . that military service be the sole motivating factor for the adverse employment action." *Id.* *Erickson* stands for the proposition that, even when an employee's acts—in that case prolonged absence— would justify the agency's adverse employment action if not related to his military service, USERRA is violated if the frowned-upon acts of the employee are required by the military service.

Here, unlike in *Erickson*, McMillan was not obligated to seek assistance from his colleagues and superiors at DEA to fulfill his military obligations, and he does not allege that he was obligated by his military supervisors to use the FSR. In the end, of course, he fulfilled his military duties without referring to the FSR in his intelligence report. The question is whether the complained-of actions are so related to his military obligations—as in *Erickson*—that it would be improper to consider them in an adverse employment action.

The Board resolved this issue against McMillan, finding that:

> Protection under USERRA is contingent on the employee's compliance with the reasonable and ordinarily accepted standards of personal conduct and performance of all employees. Hence, assuming arguendo that management denied the tour extension based solely on the appellant's conduct in connection with his military assignments, and not on performance issues, there was no USERRA

violation if the appellant failed to comply with or-
dinary accepted standards of personal conduct
and performance in the course of fulfilling his mil-
itary assignments.

J.A. 5 (citing *Figueroa Reyes*, 389 F. Supp. 2d at 212).

But as the discussion above makes clear, DEA failed
to establish that two of its proffered reasons—McMillan's
alleged performance issues and his failure to follow the
chain of command—were "ordinary accepted standards of
personal conduct and performance." *Id.* The tone in
McMillan's emails, moreover, is simply not egregious
enough to independently support the DEA's burden under
the preponderance standard, especially considering that it
was triggered by Stenkamp's reaction to McMillan's
reasonable request for assistance in fulfilling his military
obligations. If McMillan's alleged "arrogance, disrespect
and condescension," Resp't Br. 9, were characteristic, then
surely the government could have adduced evidence of
additional examples of his misconduct that were wholly
unrelated to his military service. It did not. Instead,
McMillan's previous performance reviews indicated that
there were no such issues. Indeed, all of the proffered
reasons for the denial of McMillan's tour extension were
related to the project McMillan was assigned to perform
as part of his military service and the interactions with
LCO command in connection thereto. Again, while the
DEA may have been unhappy with McMillan's military
assignment, it was not entitled to punish him for attempt-
ing to fulfill it.

We do not intend to give *carte blanche* to employees to
engage in misconduct in service of their military duties
under the protection of USERRA. But once the petitioner
meets his burden, an employer must prove, by a prepon-
derance of the evidence, that the non-military-service
justifications for the adverse employment action are
legally sufficient. For all of the reasons explained, the

DEA failed to demonstrate that it would have made the same decision in the absence of McMillan's military service.

CONCLUSION

Because substantial evidence does not support the Board's finding that McMillan failed to meet his burden under USERRA, and because the testimony proffered below by the government is insufficient to satisfy its burden, we reverse the ruling of the Board that USERRA was not violated, and remand for determination of an appropriate remedy.

**REVERSED AND REMANDED**