Concurring opinion filed by Circuit Judge REYNA.
Dissenting opinion filed by Circuit Judge HUGHES.
STOLL, Circuit Judge.
Troy Miller appeals the decision of the Merit Systems Protection Board denying him relief for a personnel action taken by the Department of Justice. The Board held that. Mr. Miller met his burden of showing that certain disclosures he made, found by the Board to be protected under the Whis-tleblower Protection Act, contributed to his reassignment. The Board further held, however, that the Government successfully rebutted Mr. Miller’s prima facie case by showing independent causation for the personnel action. Because the Board’s decision is not supported by substantial evidence, we reverse.
Background
I.
Mr. Miller worked as the Superintendent of Industries, level GS-13, at the Federal Correctional Complex, Beaumont, Texas. In this capacity, Mr. Miller oversaw a prison factory that produced ballistic helmets primarily for military use. He held significant responsibilities as Superintendent of Industries, including: managing the factory budget; executing contracts with outside suppliers; hiring, training, and overseeing inmate staff; and developing and maintaining production schedules. Performance reviews lauded Mr. Miller for taking the initiative to coordinate delivery schedules with outside vendors—a task normally performed by central office professionals—and for spearheading a business partnership with an outside armor outfitter.
UNICOR, a Government-owned corporation, operated the prison factory, but Mr. Miller worked for the Federal Bureau of Prisons within the Department of Justice, as did his direct supervisor, prison warden Jody Upton. Mr. Miller, along with the associate warden and the warden’s captain, served on Warden Upton’s executive staff. As a member of the Warden’s executive staff, Mr. Miller drafted prison security reports sent to the regional office and responded to security incidents at the Beaumont facility, as well as other correctional facilities. He was also on rotation every six weeks to serve as the prison’s acting administrative duty officer and he chaired the Inmate Issues Committee, where he was a conduit between inmates *1255 and Warden Upton, relaying inmate concerns to the warden and providing the warden’s feedback to the inmates. In Warden Upton’s absence, Mr. Miller occasionally filled in as an associate warden. Reflecting on Mr. Miller during his testimony in this case, Warden Upton described Mr. Miller as “a fantastic employee” who'was “very on top of things” and with whom he had “absolutely no concerns,” a sentiment reflected in Warden Upton’s performance evaluations of Mr. Miller. J.A. 90-92.
On October 7, 2009, Mr. Miller disclosed to individuals at UNICOR and to Warden Upton what he perceived to be mismanagement of funds at the factory. Warden Upton testified that he received a phone call in mid-to late-October 2009 from the DOJ Office of Inspector General (“OIG”) explaining that there' had been reports of impropriety at the factory, but Warden Upton could not recall with whom at OIG he spoke. On December 15, 2009, OIG conducted an on-site visit to the factory as part of an investigation into the factory’s operations and purported misconduct. Warden Upton asked Mr. Miller to not report to the factory on that day, relaying to him that the investigators did not want the factory staff to feel uncomfortable or intimidated by having their supervisor, Mr. Miller, present during the OIG visit.
On December 16, 2009, the day following OIG’s factory visit, Mr. Miller reported to Warden Upton and others that there had been a “sabotage” at the factory, with rejected Kevlar® material having been placed on the production line. J.A. 162. Mr. Miller testified that constructing a helmet using rejected material would seriously compromise the helmet’s ability to withstand projectile impact and thus would endanger the lives of soldiers outfitted in such helmets. Mr. Miller testified that “why I did what I did is there’s a U.S. Marine’s life at -the end of this helmet, period. And it is my responsibility as a superintendent. of industries when I see anything that is wrong, to report it immediately and to.stop production.” J,A. 276. Mr. Miller urged that the factory be closed pending an investigation of the alleged factory sabotage.
Several hours after the'sabotage disclosure, Warden Upton informed Mr. Miller that he was being reassigned from the factory and would no longer serve as Superintendent of Industries. Without identifying any specific individual, Warden Upton testified that some person or persons working for OIG had directed him to reassign Mr. Miller. OIG had become concerned, testified Warden Upton, that Mr. Miller might compromise its investigation by remaining at the' factory. Warden Upton testified that because Mr. Miller did not “technically work for me in the operational aspect, I contacted UNICOR’s central office, as well as my regional director” and “[a] decision was made the following day that [Mr. Miller] would need to be removed from the factory,” J.A. 101. Warden Upton further, testified that, at some point later, OIG “made it clear that Mr. Miller was actually one of the subjects of the investigation,” although he could not recall during his testimony when OIG disclosed this information to him. J.A. 99.
Over the next four and a half years, Mr. Miller was assigned to various lower-level positions which, unlike the Superintendent of Industries position, were not on the Warden’s executive staff.[1] Mr. Miller’s var *1256 ious duties, during the times when he was assigned work, included: monitoring inmate phone calls for criminal activity; assisting with the prison’s food service by wiping tables and observing inmates as they cleaned floors; performing clerical work, such as shredding documents; and working the night shift in the special housing unit.[2] Warden Upton testified that he moved Mr. Miller from one assignment to the next several times at the behest of OIG. Warden Upton testified that OIG began to fear that placing Mr. Miller in any position with inmate exposure presented a threat to the investigation. For example, Warden Upton testified that OIG believed Mr. Miller had been conversing with inmates during his food service detail and that Mr. Miller chose to monitor the phone calls of inmates who worked in. the factory during his phone detail, which the Warden’s staff was able to find some supporting correlative evidence of by examining phone records. Warden Upton again did not reveal the identity of any specific OIG employee with whom he spoke or provide OIG’s specific justification for fearing that Mr. Miller would threaten the investigation.
Eventually, Warden Upton reassigned Mr. Miller out of the medium-security prison facility altogether and to an administrative building on the prison premises. While there, Mr. Miller was told to sit on a couch in the building lobby without being given any work to perform, which he did for eight months. He later received an office, but continued to have no work assigned to him. He remained on .the GS-13 payscale all the while, yet Warden Upton testified that putting him in these positions was “absolutely” a waste of his talents.
II.
Mr. Miller brought an individual right of action (“IRA”) appeal to the Board, alleging that the DOJ’s actions against him violated the Whistleblower Protection Act (“WPA”). Particularly, Mr. Miller asserted that he made protected whistleblower disclosures, under 5 Ü.S.C, § 2302(b)(8) and that they contributed to his effective reassignment out of the Superintendent of Industries position, which he contended was a personnel action under 5 U.S.C. § 2302(a)(2)(A). Mr. Miller claimed as protected his October 2009 fund-mismanagement disclosure and his December 2009 factory-sabotage disclosure.
The Administrative Judge agreed with Mr. Miller that both his October 2009 and December 2009 disclosures were protected under § 2302(b)(8). The A.J. also found that, applying the 5 U.S.C. § 1221(e)(1) “knowledge/ timing” test, Mr. Miller’s disclosures contributed to his reassignment, which the A.J. found to be a personnel action under § 2302(a)(2)(A). Because the A.J. found that Mr. Miller made a protected disclosure and suffered an adverse personnel action, the burden shifted to the Government to show by clear and convincing evidence that it would have reassigned Mr. Miller regardless of his protected disclosures. The A.J. found that the Government met this burden, The A.J. relied almost entirely on testimony from Warden Upton in reaching this finding. The Government had also presented one of Mr. Miller’s supervisors at UNICOR, Brad Beus, as a witness, but the Government presented no testimony or documentary evidence from OIG, the group Warden Upton testified directed him to reassign Mr. Miller.
*1257 Mr. Miller petitioned the full Board for review of the A.J.’s decision. The Board affirmed the A.J.’s initial decision, and it became the Board’s final decision. Mr. Miller appeals to us, and we have jurisdiction under 5 U.S.C. § 7703(a)(1), (b)(1).
DISCUSSION
I.
IRA appeals brought under the WPA operate in a burden-shifting framework. The burden lies with the employee to show “by a preponderance of the evidence that he or she made a protected disclosure under § 2302(b)(8) that’was a contributing factor to the employee’s [personnel action].” Whitmore v. Dep’t of Labor, 680 F.3d 1353, 1367 (Fed. Cir. 2012) (citing 5 U.S.C. § 1221(e)). "If the employee establishes this prima facie case of reprisal for whistleblowing, the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken ‘the same personnel action in the absence of such disclosure,”’ id. (quoting § 1221(e)), which we sometimes refer to as a showing of “independent causation,” see, e.g., Kewley v. Department of Health & Human Services, 153 F.3d 1357, 1364 (Fed. Cir. 1998).
In evaluating whether the Government has successfully rebutted an employee’s prima facie case by demonstrating independent causation, this court has approved of .the use ;of three, albeit nonexclusive, factors described in Carr v. Social Security Administration, 185 F.3d 1318, 1323 (Fed. Cir. 1999):
[1] the strength of the agency’s evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar.actions'against employees who are not whistleblowers but who are otherwise similarly situated.
But, “[t]o be clear, Carr does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the three Carr factors to weigh them each individually in the agency’s favor.” Whitmore, 680 F.3d at 1374. Rather, “[t]he factors are merely appropriate and pertinent considerations for determining whether the agency carries its burden of proving by clear and convincing evidence that the same action would have been taken absent the whistleblowing.” Id.
By statute, we set aside the judgment of the Board if the decision is “(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence.” 5 U.S.C. § 7703(c); see also Whitmore, 680 F.3d at 1366.
II.
The Government does not dispute the Board’s threshold determination that Mr. Miller made a prima facie showing that his disclosures were WPA-protected and that they contributed to his reassignment. Thus, the burden shifted to the'Government to show independent causation. The issue before us is whether substantial evidence supports the Board’s determination that the Government showed independent causation by clear and convincing evidence. We conclude that it does not.
A. Burden of Proof and Standard of Review
Independent causation is established upon clear and convincing evidence. “ ‘Clear and convincing’ evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual con *1258 tention is ‘highly probable.’ ” Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quoting Buildex, Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1463 (Fed. Cir. 1988)); see also Colorado v. New Mexico, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1983). The clear and convincing burden of proof “imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt.” Id. (citing Buildex, 849 F.2d at 1463).
We have explained before that “there is no doubt that Congress considered it very important that federal agencies be required to clearly and convincingly rebut a prima facie case of whistleblower retaliation,” while quoting legislative history that describes the significance of the Government’s burden:
“Clear and convincing evidence” is a high burden of proof for the Government to bear. It is intended as such for two reasons. First, this burden of proof comes into play only if the employee has established, by a preponderance of the evidence that the whistleblowing was a contributing factor in the action—in other words, that the agency action was “tainted.” Second, this heightened burden of proof required of the agency also recognizes that when it comes to proving the basis for an agency’s decision, the agency controls most of the cards—the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases. In these circumstances, it is entirely appropriate that the agency bear a heavy burden to justify its actions.
Whitmore, 680 F.3d at 1367 (quoting 136 Cong. Rec. H747-48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)).
We review the Board’s finding of independent causation for substantial evidence. Kewley, 153 F.3d at 1364. “Substantial evidence ... means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). “The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.” Jacobs v. Dep’t of Justice, 35 F.3d 1543, 1546 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). “Any determination by an AJ that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or her conclusions is unreasonable and, as such, is not supported by substantial evidence.” Whitmore, 680 F.3d at 1376.
This court’s prior opinions recognize the interrelatedness of the burden of proof a party must satisfy to win its case— here, clear and convincing evidence—and our standard of appellate review—substantial evidence in this instance. The burden of proof a party faces necessarily impacts our review on appeal:
Substantial evidence is not a fixed quan-turn of evidence: What is or is not substantial may only be determined with respect to the burden of proof that the litigant bore in the trial court. “For example, in reviewing whether the evidence supports a finding of fact ... the decision might be affirmed if the standard of proof below were ‘weight of evidence’ and might be reversed on the same record if the standard of proof were ‘clear and convincing’ evidence.”
*1259 Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1362, 1363 (Fed. Cir. 2004) (omission in original) (quoting SSIH Equip. S.A. v. U.S. Int’l Trade Comm’n, 718 F.2d 365, 383 (Fed. Cir. 1983) (Nies, J., additional comments)); see also Jackson v. Veterans Admin., 768 F.2d 1325, 1330 & n.5 (Fed. Cir. 1985). Indeed, our prior WPA decisions consistently describe the clear and convincing evidentiary burden as embedded within our substantial evidence appellate review. See, e.g., Greenspan v. Dep’t of Veterans Affairs, 464 F.3d 1297, 1306 (Fed. Cir. 2006) (“We have not been shown substantial evidence in support of the agency’s burden to establish by clear and convincing evidence that it would have taken these disciplinary actions absent-the protected disclosures.” (emphases added)).[3]
B. Carr Factor Analysis
With this background in mind, we review the Board’s analysis of the Carr factors.
The first Carr factor is “the strength of the agency’s evidence in support of its personnel action.” Carr, 185 F.3d at 1323. We do not focus our review of this Carr factor on whether the agency has put forward some evidence purporting to show independent causation, but instead we focus on whether such evidence is strong. See id. at 1323-24. The Board in this case relied nearly exclusively on Warden Upton’s testimony to conclude that this factor weighed in the Government’s favor. A considerable amount of the relied-on testimony consisted of Warden Upton’s recollection of things OIG told him. We hold that no reasonable factfinder could find Warden Upton’s conclusory testimony about how OIG directed him to be strong evidence of independent causation.[4] Thus, this Carr factor could not favor the Government as the Board concluded.
The Government and the dissent rely on three pieces of allegedly substantial evidence of a strong showing of independent causation; (1) Warden Upton’s testimony that he took action because OIG told him Mr. Miller might interfere with the investigation; ' (2) Mr. Miller’s testimony that Warden Upton told him that OIG told the Warden to reassign Mr. Miller; and (3) Warden Upton’s testimony that he continued to reassign Mr. Miller because OIG told him that Mr. Miller was interfering with the investigation. Dissent 1265-266. But Warden Upton’s conclusory testimony *1260 about OIG’s statements is not made more sufficient or clear and convincing simply by being repeated several times. Indeed, this evidence all collapses into essentially supporting the same basic conclusion— OIG told Warden Upton to reassign Mr. Miller because he might interfere with the investigation. The Government’s evidence is weak, particularly when considered in light of thé record evidence endorsing Mr. Miller’s character.
The Government introduced no evidence to explain how Mr. Miller, whose second protected disclosure related to the OIG investigation, could either compromise or be a target of' an investigation into the very type of activities that he reported. To the contrary, the only evidence regarding Mr. Miller’s character was his “outstanding” performance review and Warden Upton’s testimony that Mr. Miller was “a fantastic employee” who was “confident, organized, ... [and] very on top of things.” J,A. 90-92. Warden Upton further testified that Mr. Miller “[w]as willing to do anything that you asked him to do”, and that he “sought out additional duties.” Warden Upton testified that he had “absolutely no concerns” about Mr. Miller, “a very good employee” who served on his executive staff, and Warden Upton testified that he had no reason to place him under investigation. Id. To reach the conclusion the Government suggests—that OIG directed the reassignment of Mr. Miller to various menial jobs and ultimately the couch for four and a half years" for fear that he would interfere with an investigation allegedly targeting him—a reasonable fact finder would have to conclude that Mr. Miller made his protected disclosures of mismanagement as part of a cover-up. The record is devoid of any evidence supporting such a theory. To the contrary, the record demonstrates that Mr. Miller was a twenty-one-year employee of the Federal Bureau of Prisons and former U.S. Marine who was concerned about the quality of the advanced combat helmets manufactured by the prison factory. The record further demonstrates that Mr. Miller was a valued executive, whose expertise and attention to detail made his product line one of the most successful in the Agency.
Warden Upton’s testimony was the only evidence supporting the seemingly unusual basis for Mr, Miller’s four-and-a-half year reassignment following his protected disclosures. Yet the Warden could not testify as to significant details, such as who at OIG he communicated with'. The Government failed to present any other witness testimony to support its argument that Mr. Miller was removed out of concern that he might’somehow interfere with the OIG investigation. Mr. Beus—who was Mr. Miller’s supervisor at the Government-owned corporation that opérated the factory, UNICOR—was the Government’s only other witness and he did not corroborate Warden Upton’s testimony. While Mr. Beus testified about Mr. Miller’s protected disclosures and the OIG investigation generally, his only testimony regarding Mr. Miller’s reassignment was that he had no input into the reassignment decision. J.A. 501-02 (“Q: Okay. So did you have any input in Mr. Miller being removed from his position as [Superintendent of Industries] on that day? A: No.”). He did not testify as to who made the reassignment decision or for what reason.
The Government also failed to present any documentary evidence supporting its position. Mr, Miller was repeatedly reassigned over the course of a four-and-a-half year period, and for each step, the Government did not present a single email, memorandum, or personnel action form documenting or providing the bases for the agency’s action. Common sense tells us that these repeated reassignments, occurring over a significant span of time, are the *1261 types of personnel actions for which papers would normally attach.
To be clear, we do not hold today that testimony must be corroborated to support a showing of independent causation, although that is one of potentially many ways that the Government could have made its weak evidentiary showing' stronger in this case. Likewise, we do not accept Mr. Miller’s invitation to view Warden Upton’s testimony as not credible. See Chambers v. Dep’t of Interior, 515 F.3d 1362, 1370 (Fed. Cir. 2008) (holding the Board’s “credibility determinations are ‘virtually unreviewable’ at this level” (quoting Hambsch v. Dep’t of Treasury, 796 F.2d 430, 436 (Fed. Cir. 1986))). But even taking the Warden’s testimony at face value, we conclude that his - bare testimony about what OIG directed him to do affords only minimal support for Mr. Miller’s removal when considered in light of the remainder of the record in this case, including the Board’s unchallenged findings that Mr. Miller made protected disclosures, that those disclosures contributed to his removal, and that Mr. Miller was by all accounts an outstanding employee. Without introducing any other testimony or documentary evidence—for example, from OIG, the group that the Warden testified, see J.A. 118, and the Government concedes, see Oral Argument at 37:32-55, drove the December 2009 reassignment decision—there is a significant weakness in the quantum of the Government’s evidence going towards the first Carr factor. By pointing to the lack of corroboration, the dearth of documents, emails, or l-ecords, and even the lack of detail in Warden Upton’s recollection, we are not assessing Warden Upton’s credibility. Rather, we are doing precisely what our review of this Carr factor demands: assessing whether a factfinder could reasonably conclude that the Government presented strong evidence of independent causation. We conclude that one could not and that this factor, therefore, could not cut in the Government’s favor as the Board found.
The second Carr factor is “the existence and strength of any motive to retaliate on the part of the agency'officials who were involved in the decision.” Carr, 185 F.3d at 1323. The A.J. found that Warden Upton had “little or no motive to retaliate against” Mr. Miller. J.A. 136. In reaching this conclusion, the A.J. relied on the fact that Warden Upton did not exercise direct oversight over the factory and the Warden’s testimony that it did not matter much'to him whether the factory turned a profit.
While the Board’s analysis of this factor was reasonable, we note that the Warden testified that he did, in fact, have an interest in thé ongoing operation of the prison factory to keep inmates “out of trouble” and occupied, instead of sitting around for months at a time. The Warden also testified that a possible shutdown of the factory would “create concern,” because “you have to figure out how that fits into your daily operational plan.” J.A. 116-17. And regarding the A.J,’s reliance on the Warden’s lack of direct factory oversight, we have previously admonished the Board for taking a dismissive approach to the retaliatory motive Carr factor merely because a supervisor isn’t directly involved' in the work at issue in an employee’s protected disclosure. In Whitmore, the A.J. found no evidence that the removing officials had a retaliatory motive against the . employee because they were outside of his chain of command and were not implicated by his whistleblowing. 680 F.3d at 1370-71. We found that this analysis took “an unduly dismissive and restrictive view of Carr factor two,” id. at 1370, and remanded with instructions for broader consideration of this factor, id. at 1372. We explained that “[tjhose responsible for the agency’s per *1262 formance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, and even if they do not know the whistleblower personally, as the criticism reflects on them in their capacities as managers and employees.” Id. at 1370 (citations omitted).
We also find it concerning that the A.J. made a finding regarding Warden Upton’s retaliatory motive, but none regarding OIG’s motive. The precise language from Carr makes clear that this factor should be evaluated more generally, as the factor is directed towards “agency officials who were involved in the decision,” not just the employee’s direct supervisor. Carr, 185 F.3d at 1323; see also Whitmore, 680 F.3d at 1371 (“[A]n agency official’s merely being outside that whistleblower’s chain of command, not directly involved in alleged retaliatory actions, and not personally named in the whistleblower’s disclosure is insufficient to remove the possibility of a retaliatory motive or retaliatory influence on the whistleblower’s treatment.”). Considering that, in this case, it was OIG that purportedly directed the Warden to reassign Mr. Miller, it would seem important in this case to examine whether one could impute a retaliatory motive to OIG.
Given these considerations, the evidence for this factor does not unfailingly support the Government. Nonetheless, given the Warden’s testimony that he had no reason to be concerned about the factory’s profits, the Board’s conclusion that this factor ultimately tips in the Government’s favor is reasonable.
The third and final Carr factor is “any evidence that the agency takes similar actions against employees who are not whis-tleblowers but who are otherwise similarly situated.” Carr, 185 F.3d at 1323. The A.J. found that there was no basis for evaluating this factor because Warden Upton testified that no other similar investigations involving members of his executive staff occurred during his tenure as Warden.
The Government took an exceedingly narrow approach in addressing this factor. The Warden’s testimony shows there to be a lack of similarly situated non-whistle-blowers only at the Beaumont prison facility working on the Warden’s four-member executive staff specifically and only during his tenure there. The Government introduced no evidence as to what actions it takes against other DOJ employees during OIG investigations despite this factor being directed to the “agency” rather than to a particular supervisor at a particular Federal Bureau of Prisons facility. It may be the case that the DOJ transfers employees pending investigation by OIG with some regularity, but the Government has put forward no evidence of that here. The Government provided no evidence that the treatment of Mr. Miller is comparable to similarly situated employees who are not whistleblowers, and the court may not simply guess what might happen absent whist-leblowing. The burden lies with the Government.
The Government bears the risk associated with having no evidence on record for this factor. For while we have indicated that “the absence of any evidence relating to Carr factor three can effectively remove that factor from the analysis,” we further explained that the Government’s failure to produce evidence on this factor “may be at the agency’s peril” considering the Government’s advantage in accessing this type of evidence. Whitmore, 680 F.3d at 1374 (internal citations omitted). Indeed, “the absence of any evidence concerning Catr factor three may well cause the agency to fail to prove its case overall.” Id. Thus, this factor adds little to the overall analysis in this case, but if anything, tends to cut slightly against the Government.
*1263 Considering the record as a whole, we are struck by the want of evidence presented by the Government to show independent causation. Although the Government adduced some evidence for Carr factor two, the strength of its independent causation evidence (Carr factor one) was weak, and it adduced no evidence whatsoeyer for Carr factor three. While we again recognize that the Government need not introduce evidence for each Carr factor, or prove that each weighs in its favor to meet its burden, id. we cannot say that substantial evidence supports a finding that the Government clearly and convincingly proved independent causation in this case. The Government must do more than it did here to satisfy the “high burden of proof’ that Congress demanded in cases where the employee has already shown that whistleblowing was a contributing factor and the burden shifts to the Government to show independent causation. Id. at 1367 (quoting 135 Cong. Rec. H747-48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)). Thus, we conclude that there is not substantial evidence to support the Board’s. determination that the Government proved by clear and convincing evidence that it would have reassigned Mr. Miller even in the absence of his protected disclosures.
Contrary to the dissent’s suggestion, we do not hold that Warden Upton is not credible or that his testimony requires corroboration as a matter of law. Nor have we reweighed the evidence. The dissent accuses our opinion of having a breadth that it simply does not have. We merely hold that, in this case, there is a failure of proof because the Government did not meet its burden. Congress instituted a particular statutory framework for analyzing whistle-blower cases, including a heightened burden of proof once the whistleblower has established by a preponderance of the evidence that whistleblowing was a contributing factor in a personnel action. “This heightened burden of proof required of the agency recognizes that when it comes to proving the basis for an agency’s decision, the agency controls most of the cards—the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases.” Id. Here, there is a dearth of evidence establishing independent causation: no testimony other than Warden Upton’s conclusory testimony, no documents whatsoever supporting the agency’s action, and no records to document similar actions in other cases.
The dissent also alleges that we fail to “cite to a single piece of affirmative evidence that Mr. Miller was reassigned for whistleblowing.” Dissent 1269. But the dissent wholly ignores what the Board already found and the Government does not dispute on appeal: Mr. Miller “made protected disclosures under 5 U.S.C. § 2302(b)(8) that were a contributing factor in the decision to reassign him.” Miller v. Dep’t of Justice, No. DA-1221-11-0401-W-3, 2015 WL 1548991 (M.S.P.B. Apr. 8, 2015). Thus, our review is strictly limited to whether the Government met its steep burden to show independent causation guided by the Carr factors, in which the dissent fails to ground its discussion.
Finally, the dissent accuses our opinion of failing “to appreciate the impact of [this] decision on the agency” and Warden Upton[5] because the agency likely will be *1264 required to report this case to Congress. Dissent 1269. But sympathy for the agency does not bear on the question before us. The statutory framework this court must follow requires us to consider whether a reasonable fact finder could find the Government met its “heavy burden to justify its actions” after the employee had already established that-whistleblowing was a contributing factor in the action. Whitmore, 680 F.3d at 1367 (quoting 136 Cong. Rec. H747-48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)). We conclude that, in this case, one could not.
Conclusion
For the foregoing reasons, we reverse the Board’s decision and remand for further proceedings including determination of the remedy appropriate for the improper personnel action.
REVERSED AND REMANDED
Costs ,
Costs to Petitioner.

. Warden Upton testified that the prison helmet factory closed somewhere between August and September 2011, nearly two years after Mr. Miller was initially reassigned out of the helmet factory. Mr. Miller received notification that he was being permanently reassigned from the Superintendent of Industries *1256 position to the position of Camp Administrator because of the factory closing.

. Mr, Miller testified that the night shift was not desirable, and that he had not previously worked in the special housing unit.

, See also Briley v. Nat’l Archives & Records Admin., 236 F.3d 1373, 1381 (Fed. Cir. 2001); Agoranos v. Dep’t of Justice, 602 Fed.Appx. 795, 805 (Fed. Cir. 2015); Losada v. Dep’t of Def., 601 Fed.Appx. 940, 943 (Fed. Cir. 2015); Cassidy v. Dep’t of Justice, 581 Fed.Appx. 846, 847 (Fed. Cir. 2014); McCarthy v. Int’l Boundary & Water Comm’n, 497 Fed.Appx. 4, 14 (Fed. Cir. 2012); Porzillo v. Dep't of Health & Human Servs., 369 Fed.Appx. 123, 127 (Fed. Cir. 2010); Wadhwa v. Dep’t of Veterans Affairs, 353 Fed.Appx. 435, 438 (Fed. Cir. 2009); Pedeleose v. Dep’t of Def., 343 Fed. Appx. 605, 609-10 (Fed. Cir. 2009); King v. Dep’t of Veterans Affairs, 276 Fed.Appx. 996, 998 (Fed. Cir. 2008); Dennis v. Dep’t of Veterans Affairs, 191 Fed.Appx. 961, 964 (Fed. Cir. 2006); Tomei v. Dep’t of Educ., 113 Fed.Appx. 920, 923 (Fed. Cir. 2004); Kraushaar v. Dep’t of Agric., 60 Fed.Appx. 295, 298 (Fed. Cir. 2003); Meyers v. Dep’t of Veterans Affairs, 33 Fed.Appx. 523, 527 (Fed. Cir. 2002); Maston v. Dep’t of Justice, 10 Fed.Appx. 937, 942 (Fed. Cir. 2001); Beadling v. Dep’t of Justice, 4 Fed.Appx. 798, 801 (Fed. Cir. 2001); Gray v. Dep’t of Interior, 250 F.3d 763 (Fed. Cir. 2000) (non-precedential); Bristow v. Dep’t of Army, 232 F.3d 908 (Fed. Cir. 2000) (non-precedential).

. The parties disagree as to whether such testimony constitutes hearsay or, rather; whether it falls within a hearsay exception. We find that resolving this dispute bears little on the ultimate issue. Hearsay may be admitted as preponderant evidence in Board proceedings "if, to a reasonable mind, the circumstances are such as to lend it credence.” Kewley, 153 F.3d at 1364.

. The dissent asserts that harm will come to Warden Upton as a result' of our decision. We reiterate, however, that we do not question Warden Upton’s veracity. We simply conclude that, given the other evidence of record, the Government’s sole reliance on his conclusory *1264 and unsupported testimony was not enough to satisfy the Government’s burden.