# United States Court of Appeals
# for the Federal Circuit

———————————

**CLARENCE ANDREW MCGUFFIN,**
*Petitioner*

**v.**

**SOCIAL SECURITY ADMINISTRATION,**
*Respondent*

———————————

2017-2433

———————————

Petition for review of the Merit Systems Protection Board in No. DC-4324-14-0938-B-1.

———————————

Decided: November 7, 2019

———————————

CLARENCE ANDREW MCGUFFIN, Raleigh, NC, argued pro se.

SONIA MARIE ORFIELD, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by CLAUDIA BURKE, ROBERT EDWARD KIRSCHMAN, JR., JOSEPH H. HUNT.

———————————

Before MOORE, REYNA, and CHEN, *Circuit Judges.*

REYNA, *Circuit Judge.*

Clarence McGuffin appeals from a determination of the Merit Systems Protection Board that the Social Security Administration did not violate the Uniformed Services Employment and Reemployment Rights Act when it terminated Mr. McGuffin's employment. Because we conclude that substantial evidence does not support the Board's findings, we reverse the decision of the Board and remand for further proceedings.

## I. BACKGROUND

### A. Statutory Background

Mr. McGuffin brings a discrimination claim pursuant to the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), Pub. L. No. 103–353 (codified as amended at 38 U.S.C. §§ 4301–35), which prohibits discrimination based on prior or current military service. Central to Mr. McGuffin's discrimination claim is the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95–454, 92. Stat. 1111 (codified as amended in scattered sections of Title 5 of the United States Code), which provides certain procedural safeguards ("CSRA benefits") to an "employee" serving in the excepted civil service. *See* 5 U.S.C. §§ 7511, 7513. The CSRA provides that

> An employee against whom an action is proposed is entitled to—
>
> (1) at least 30 days' advance written notice, unless there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed, stating the specific reasons for the proposed action;
>
> (2) a reasonable time, but not less than 7 days, to answer orally and in writing

and to furnish affidavits and other documentary evidence in support of the answer;

(3) be represented by an attorney or other representative; and

(4) a written decision and the specific reasons therefor at the earliest practicable date.

5 U.S.C. § 7513(b)(1)–(4). An excepted civil service employee is also entitled to appeal an adverse action to the Merit Systems Protection Board (the "Board" or the "MSPB"). *Id*. § 7513(d).

Qualifying veterans in the excepted civil service, also referred to as "preference-eligible" veterans, receive employee status and CSRA benefits after completing a one-year probationary period of "current continuous" employment. *Id*. § 7511(a)(1)(B). Non-veterans in the excepted civil service receive employee status and CSRA benefits after completing two years of current continuous employment. *Id.* § 7511(a)(1)(C). An employer may terminate an individual during his probationary period if the individual "fails to demonstrate his fitness or his qualifications for continued employment . . . ." 5 C.F.R. § 315.804(a). The employer, however, "must honestly be dissatisfied with the probationer's conduct or performance after giving him a fair trial on the job." *Shaw v. United States*, 622 F.3d 520, 544 (Ct. Cl. 1980) (quotation omitted) (discussing 5 C.F.R. § 315.804(a) (1975)).

## B.  SSA Policies and Procedures

Mr. McGuffin, a preference-eligible veteran, was hired as an attorney advisor by the Social Security Administration ("SSA" or the "agency"), Office of Disability Adjudication and Review ("ODAR"), for its office in Raleigh, North Carolina. As SSA's appellate branch, ODAR reviews and issues decisions on disability claims. Attorney advisors,

also known as "decision writers," assist the agency's Administrative Law Judges ("ALJ") by researching and drafting decisions.

SSA evaluates its attorney advisors based on a variety of factors, which vary depending on the seniority of the attorney advisor. First, as noted in the SSA Personnel Policy Manual, SSA evaluates new hires, like Mr. McGuffin, during the first year of employment under a limited performance evaluation program based on the following two elements: "interpersonal skills" and "engages in new learning." J.A. 464, 640–41. The SSA Personnel Policy Manual notes that new hires are placed on this limited evaluation program because "the first year of employment in their new SSA position may be spent in formal classroom and on-the-job training," and, thus, the limited evaluation program "allows those employees additional time to demonstrate performance in all elements of their positions." J.A. 480. To meet the "interpersonal skills" element, the SSA Personnel Policy Manual notes that a new hire should treat the public and fellow employees with courtesy and respect, listen to feedback from co-workers and managers, communicate effectively and maintain positive and productive working relationships. To satisfy the "engages in new learning" element, the SSA Personnel Policy Manual notes that a new hire should participate in training, accurately process work, and demonstrate progress toward independent completion of work.

Second, SSA evaluates employees past their first year of employment under four elements: "interpersonal skills," "participation," "demonstrates job knowledge," and "achieves business results." J.A. 465. Relevant to this appeal is the "achieves business results" element, which requires an employee to produce his "fair share of work." J.A. 468.

The "fair share" standard is determined by dividing the total number of cases Congress funds SSA to adjudicate by

the number of SSA decision writers available to write decisions. An attorney advisor's fair share varies month-to-month, depending on the amount of cases assigned to a given ODAR office. The fair share standard does not apply to attorney advisors during their first year of employment.

Third, SSA tracks the productivity of all attorney advisors, both new and permanent, by utilizing the Decision Writer Statistical Index ("DWSI"). Based on this index, the agency circulates a monthly report that indicates whether an employee has completed his assigned cases for that month. If an attorney advisor completes all the work assigned to him each month, his DWSI score would be 100%. The DWSI allots four hours for a decision where the ALJ grants a claim, and eight hours where the ALJ denies a claim. As the SSA Personnel Policy Manual notes, numeric data—such as the DWSI rating, the timeliness and accuracy of work, and the need to produce a fair share of the workload—"may be gathered and maintained in order to provide context to performance standards and expectations," but it cannot be the sole basis for terminating an employee. J.A. 823, 842.

Fourth, SSA tracks the productivity of both new and permanent attorney advisors by using a seven-day benchmark. Under that benchmark, attorney advisors should write a decision in seven days. This benchmark is a goal, not an absolute requirement. SSA does not remove employees based solely on their failure to meet the seven-day benchmark.

### C. Mr. McGuffin's Employment at SSA

On February 8, 2010, Mr. McGuffin began his employment with SSA as a preference-eligible veteran who was entitled to receive CSRA benefits after one year of service. Mr. McGuffin's direct supervisor was Mark Thompson, who in turn reported to William Strong, the Hearing Office Director for the Raleigh ODAR office.

During Mr. McGuffin's initial months at the agency, Mr. McGuffin had a low monthly case completion rate, as measured by the DWSI, and Mr. McGuffin had some cases that were past the seven-day benchmark. Aware of this, Mr. McGuffin reached out to Mr. Thompson for training opportunities, noting that he wanted to take "immediate and comprehensive steps to increase [his] productivity to an appropriate level," and requested "some needed orientation and training." J.A. 580. Mr. McGuffin noted that he was specifically "looking forward" to attending "decision writer training" "as soon as possible" and that "it would help [him] to do [his] job more competently and more quickly." *Id.* SSA eventually sent Mr. McGuffin to a two-week decision-writer training course in July 2010.

Also, during these initial months, SSA was satisfied with Mr. McGuffin's performance. In March 2010, ALJ John Thawley, located in the Raleigh ODAR office, noted that Mr. McGuffin "did a very nice job," on a decision he drafted for him, noting it was "[d]etailed, thorough, [and] well put together." J.A. 1157. In April 2010, Mr. Thompson completed an evaluation report for Mr. McGuffin, noting that Mr. McGuffin "continues to work on processing his work timely and accurately," and that he "demonstrates willingness to progress towards independent completion of his work." J.A. 500. Mr. Thompson also noted that "[o]nce [Mr. McGuffin] completes training," he "will be a great employee." *Id.* In July 2010, ALJ Lisa Hall, also located in the Raleigh ODAR office, provided feedback to Mr. McGuffin, noting that, aside from going into too much detail and some spelling errors, Mr. McGuffin did a "good job on the substantive summary" in a decision he drafted. S. J.A. 28.

Despite Mr. McGuffin's favorable performance, by mid-October 2010, SSA began to consider terminating Mr. McGuffin. On October 16, 2010, Mr. Strong emailed Paula Bosworth, a senior attorney advisor at ODAR, that he was "considering removing" Mr. McGuffin. J.A. 234. Mr.

Strong also indicated that he was considering removing another attorney advisor also hired in February 2010, Angela Banks. *Id.* Mr. Strong noted that "[n]either of them is performing up to the standards we expect." *Id.* Ms. Banks, unlike Mr. McGuffin, was not a preference-eligible veteran and would therefore receive procedural safeguards after a two-year probationary period.

On October 25, 2010, Ms. Bosworth emailed ALJ Kathleen McGraw, the Deputy Regional Chief ALJ in the Regional Office, regarding the termination of Mr. McGuffin and Ms. Banks. ALJ McGraw, whose duties included advising local ODAR offices on labor-and-management issues, replied that "[t]he vet[eran] **has to be terminated** in his first year—for [Ms. Banks] it is 2 years." J.A. 223 (emphasis added). Ms. Bosworth asked: "why **must** the veteran be terminated within his first year?" *Id.* (emphasis added). ALJ McGraw responded that, as a preference-eligible veteran in the excepted service, Mr. McGuffin would acquire procedural and appellate rights after completing one year of service. *Id.* Having received clarification, Ms. Bosworth notified Mr. Strong on October 27, 2010, that "**Mr. McGuffin must be terminated** prior to the end of his first year. Angela Banks may be terminated any time within her 2-year trial work period, but if you want to let her go within the first year also, that is fine." J.A. 234. (emphasis added). Ms. Banks was not fired and ultimately received a promotion.

That same day, Mr. Thompson evaluated Mr. McGuffin's performance for a second time. Mr. Thompson noted twice in Mr. McGuffin's evaluation report that he was not producing his "fair share," a factor which is part of the "achieves business results" element, which is not applicable to new hires. First, under the "engages in learning element," Mr. Thompson noted that Mr. McGuffin "demonstrates the willingness to progress towards independent work, but he has not been able to complete his fair

share since he began," and that his "level of work is unacceptable." J.A. 501. Second, under the "interpersonal skills" element, Mr. Thompson noted that Mr. McGuffin "has not produced his fair share of the workload since he began to count as a full time writer." *Id.* Although he indicated concerns regarding Mr. McGuffin's ability to complete his fair share, Mr. Thompson gave Mr. McGuffin an overall rating of "Successful Contribution." *Id.*

In November 2010, SSA proceeded with its plan to terminate Mr. McGuffin. On November 3, 2010, Mr. Thompson emailed Mr. Strong that it was better to terminate Mr. McGuffin rather than to provide him with additional training because he was going to "be a problem for us in the long run." J.A. 825. Additionally, Mr. Strong requested sample termination letters from Ms. Bosworth and informed her that Mr. McGuffin was performing "well below his fair share" and that "[b]y and large the ALJs are not satisfied with his quality." J.A. 824. Ms. Bosworth responded that the fair share standard was not usually applied to first year hires and asked whether "Mr. McGuffin's low productivity shows he is not engaging learning." *Id.* Mr. Strong forwarded Ms. Bosworth's email to Mr. Thompson, noting that "we will have to approach this [termination] using the terminology that [Mr. McGuffin's] low production . . . shows that he is not engaging in learning adequately/sufficiently." *Id.*

In December 2010, Mr. Thompson reached out to Mr. McGuffin concerning various outstanding cases. Mr. McGuffin responded, acknowledging that his cases were overdue and that he "derive[d] no pleasure from being the slowest writer in Raleigh ODAR." S. J.A. 46. Mr. McGuffin also noted that he was "willing to try almost anything" to achieve the "numbers expectation." *Id.*

During this month, Mr. McGuffin received positive feedback from ALJ Robert Phares, who was located in the Raleigh ODAR office. ALJ Phares emailed Mr. McGuffin

that he "especially appreciate[d] the time [Mr. McGuffin] spent going into detail as to why the medical findings do not support disability," which was "[s]o much better than just canned language." J.A. 504. ALJ Phares noted that the "details" in the opinion prepared by Mr. McGuffin "are just crushing to any lawyer deciding as to whether an appeal would be successful." *Id.*

Despite ALJ Phares' praise, Mr. Thompson emailed a draft termination letter for review to Ms. Bosworth just two days later, stressing that he "hope[d] to relieve [Mr. McGuffin] of his duties prior" to the end of Mr. McGuffin's one-year probationary period. J.A. 822. Upon review of the draft, Ms. Bosworth responded, warning Mr. Thompson that he could not base Mr. McGuffin's termination on a "numerics [sic] standard," which the agency did not employ, and that they "may need to think about another way to approach this." J.A. 823.

In late December 2010, Ms. Bosworth emailed ALJ McGraw that Mr. McGuffin's "performance situation is a bit problematic because of his disability," a cognitive disability which is characteristic of a preference-eligible veteran, and asked whether they should put Mr. McGuffin on a two-week training assistance plan. ALJ McGraw agreed that a "quick assistance plan may be in order" and reminded Ms. Bosworth that a preference-eligible veteran's procedural rights vest after one year. Ms. Bosworth then emailed Mr. Thompson that Mr. McGuffin should be placed on a two-week training assistance plan "ASAP," reminding Mr. Thompson that Mr. McGuffin was a preference-eligible veteran and that "any action separating him from employment must be issued and effective on 2/8/11 to be on the safe side." J.A. 1110.

At the behest of Ms. Bosworth, Mr. McGuffin's supervisors placed Mr. McGuffin in a training assistance program from January 5, 2011 to January 26, 2011. As part of the plan, the agency assigned Mr. McGuffin cases daily,

as opposed to weekly, to help him prioritize and efficiently manage his time. During this time, ALJ Hall requested that Mr. McGuffin take another "stab" at a decision he wrote for her. S. J.A. 50. In addition, ALJ Edward Bowling, located in the Raleigh ODAR office, noted that Mr. McGuffin did an "excellent job" on a case and that Mr. McGuffin "even convinced" him that he "made the right decision." J.A. 503. Most notably, Mr. McGuffin significantly improved in productivity under the training assistance plan, increasing his monthly DWSI rating from 46% in December 2010 to 80% in January 2011.

On January 26, 2010, despite Mr. McGuffin's improvement throughout the previous three weeks, Mr. Strong emailed Ms. Bosworth, stating that Mr. McGuffin "had not fared well" under the training assistance plan and that they needed to "pursue removal before [Mr. McGuffin's] year expires on 02/08/2011." J.A. 1112. Mr. Strong also stated that "[w]e have bent over backwards to try to be fair." J.A. 247. Ms. Bosworth responded to Mr. Strong's email, requesting a draft termination letter for Mr. McGuffin "immediately." J.A. 1113. Mr. Thompson subsequently sent Ms. Bosworth a draft termination letter.

On January 27, 2011, Ms. Bosworth reviewed Mr. McGuffin's draft termination letter and notified Mr. Thompson that the draft termination letter should not "talk[] about the statistical index," which was a measure for assigning cases, not measuring performance. J.A. 508. Ms. Bosworth then revised the draft termination letter by recrafting Mr. Thompson's concern that Mr. McGuffin consistently failed to meet his fair share into one regarding Mr. McGuffin's inability to independently complete his work, a factor within the "engages in new learning" element applicable only to new hires. J.A. 510, 514. Ms. Bosworth also included in the draft termination letter that Mr. McGuffin had attended training in January 2011 and that ALJ Hall requested that Mr. McGuffin re-draft a decision

but failed to mention that Mr. McGuffin's DWSI rating dramatically improved and that he received positive feedback from ALJ Bowling. *Id.*

Ms. Bosworth then sent the revised draft termination letter to the SSA Office of General Counsel and the SSA Labor-Management Employee Relations Team for their approval. Ms. Bosworth noted that Mr. McGuffin was a "veteran's preference" and that "we want to terminate him within his first year of service so that he does not acquire MSPB rights." J.A. 1117, 1124. Because Mr. McGuffin would complete one year of employment on February 7, 2011, Ms. Bosworth highlighted that they needed to terminate him no later than February 4, 2011.

On February 4, 2011, four days before attaining full employee status, SSA terminated Mr. McGuffin. Mr. McGuffin's termination letter states that he was being terminated for "failure to demonstrate" the ability to "satisfactorily perform the duties" of the attorney advisor position. J.A. 190. The letter further explains that Mr. McGuffin did not perform his duties "accurately and independently," and that Mr. Strong did "not believe that further training efforts would be productive." *Id.*

### D. Post-Termination Proceedings

Following his termination, Mr. McGuffin unsuccessfully challenged his termination before the Equal Employment Opportunity Commission ("EEOC"), alleging that SSA had unlawfully discriminated against him based on his disability. During the EEOC proceeding, Mr. McGuffin deposed ALJ McGraw, asking her whether the "fact that [he] would obtain MSPB appeal rights after one year" as a preference-eligible veteran was "relevant in the decision to terminate [his] employment." J.A. 555. ALJ McGraw responded "yes." J.A. 556. ALJ McGraw further testified that it was "true" that there was a "rush" to terminate Mr. McGuffin prior to the end of his first year. J.A. 558. ALJ McGraw also testified that "we would prefer not to have to

go through the formal process of an MSPB hearing," and that "[w]e advise managers if they know someone is not going to work out as a – as a writer . . . to terminate that individual before their MSPB appeal rights vest . . .." J.A. 556, 559.

Following his EEOC case, Mr. McGuffin sought corrective action before the MSPB, claiming that the SSA denied him a benefit of his employment because of his military status when he was terminated within the one-year probationary period applicable to preference-eligible veterans, in violation of USERRA. On June 16, 2017, the Board denied Mr. McGuffin's request for corrective action, finding that SSA's termination of Mr. McGuffin did not violate USERRA. The Board concluded that SSA properly found Mr. McGuffin's "performance during that initial year unacceptable, and acting [sic] promptly to terminate his employment before he acquired employee status with Board appeal rights." J.A. 9. The Board also found credible the testimony of Mr. Strong, Mr. Thompson, and ALJ McGraw that "they would have terminated any employee who was performing as poorly as the appellant was after almost a year of training, even if their trial periods extended for an additional year." J.A. 22. The Board concluded that, based on the testimonies of Mr. Strong, Mr. Thompson, and ALJ McGraw, SSA "demonstrated by preponderant evidence that it would have taken the same action against [Mr. McGuffin] without regard to his military status." J.A. 22. The Board's decision became final on July 21, 2017. Mr. McGuffin appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## II. STANDARD OF REVIEW

Our review of MSPB decisions is statutorily limited. *See* 5 U.S.C. § 7703(c). We must set aside a Board decision when it is "[1] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [2] obtained without procedures required by law, rule or regulation having

been followed; or [3] unsupported by substantial evidence." *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed. Cir. 1984). "Underlying factual determinations are reviewed for substantial evidence." *McMillan v. Dep't of Justice*, 812 F.3d 1364, 1371 (Fed. Cir. 2016).

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Miller v. Dep't of Justice*, 842 F.3d 1252, 1258 (Fed. Cir. 2016) (quotation omitted). Accordingly, "[a]ny determination by an AJ that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or her conclusions is unreasonable and, as such, is not supported by substantial evidence." *Id.* (quotation omitted).

## III. DISCUSSION

USERRA prohibits discrimination in employment on the basis of military service. 38 U.S.C. § 4311; *Erickson v. U.S. Postal Serv.*, 571 F.3d 1364, 1368 (Fed. Cir. 2009); *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1012 (Fed. Cir. 2001). The statute provides:

(a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

. . . .

> (c) An employer shall be considered to have engaged in actions prohibited . . . under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service . . . .

38 U.S.C. § 4311. A "benefit of employment" includes "any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement." *Id.* § 4303(2).

The employee asserting a USERRA claim has the initial burden of showing by a preponderance of the evidence that his "membership . . . in the uniformed services" was a substantial or motivating factor in the adverse employment action. *Id.* § 4311(c)(1); *Erickson*, 571 F.3d at 1368. Once an employee has met this burden, the burden shifts to the employer to prove by preponderant evidence that it "would have taken the adverse action anyway, for a valid reason." *Sheehan*, 240 F.3d at 1013. An employer violates USERRA "if it would not have taken the adverse employment action but for the employee's military service or obligation." *Erickson*, 571 F.3d at 1368.

## A.

We first turn to whether Mr. McGuffin sufficiently proved by preponderant evidence that his preference-eligible veteran status was a substantial or motivating factor in his termination. "[M]ilitary service is a motivating factor for an adverse employment action if the employer 'relied on, took into account, considered, or conditioned its decision' on the employee's military-related . . . obligation."

*McMillan*, 812 F.3d at 1372 (quoting *Erickson*, 571 F.3d at 1368). Because employers "rarely concede an improper motivation for their employment actions," employees may meet their burden by submitting evidence from which such a motive may be fairly inferred. *Id.*

To determine if discriminatory motive can be reasonably inferred, this court considers the so-called four, non-exclusive "*Sheehan* factors," which are:

> [1] proximity in time between the employee's military activity and the adverse employment action, [2] inconsistencies between the proffered reason and other actions of the employer, [3] an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and [4] disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Sheehan*, 240 F.3d at 1014.

The Board determined that SSA's rush to terminate Mr. McGuffin before he obtained his CSRA benefits was a proper exercise of its "management prerogative." J.A. 8. SSA, however, cannot escape liability under USERRA when Mr. McGuffin's CSRA benefits are intrinsically tied to his preference-eligible veteran status. Guiding our reasoning is *Erickson*, in which this court explained that an employer cannot discriminate against an employee for action that is intrinsically tied to his military service. *See Erickson*, 571 F.3d at 1368.

In *Erickson*, the Postal Service stated that the sole reason for removing the employee was his excessive use of military leave. *Id.* The Board found that "Erickson had failed to show that his military service was a motivating factor for the agency's action because the 'real reason' for his removal was his absence from work—regardless of whether that absence was caused by his military obligation." *Id.*

This court rejected that argument, holding that "[a]n employer cannot escape liability under USERRA by claiming that it was merely discriminating against an employee on the basis of his absence when that absence was for military service." *Id.* Permitting otherwise "would eviscerate the protections afforded by USERRA" to those who serve or have served in the military. *Id.* So too here. The one-year timeline for obtaining CSRA benefits is intertwined with a veteran's prior military service. If employers could discriminate against veterans based on this one-year timeline, then what Congress created as a benefit to veterans for their service—a shortened timeframe for obtaining CSRA protection—could be turned against the veteran by employers, who, like ALJ McGraw, "would prefer not to have to go through the formal process of an MSPB hearing." J.A. 556. Thus, the proper inquiry on appeal is not simply whether Mr. McGuffin's preference-eligible veteran status played a substantial or motivating factor in his termination, but also whether it was a substantial or motivating factor in SSA's *timing* of his termination, which occurred four days before he was set to receive CSRA benefits.

In this case, no reasonable inference of discrimination under the *Sheehan* factors is needed. The record compels a finding that SSA's decision to terminate Mr. McGuffin *when it did*—four days before he completed one year of employment—was substantially motivated by Mr. McGuffin's preference-eligible veteran status.

To summarize, by late October 2010, after becoming aware of Mr. McGuffin's preference-eligible veteran status, SSA decided that Mr. McGuffin "must" be terminated before his one-year mark in order to prevent him from receiving CSRA benefits. J.A. 234. Then, from November 2010 to December 2010, Mr. McGuffin's supervisors refused to offer additional training to Mr. McGuffin and became solely focused on finalizing his termination before his one-year mark. J.A. 825, 1099, 1100, 1113. In January 2011, at the

behest of Ms. Bosworth, Mr. McGuffin's supervisors finally placed Mr. McGuffin in additional training. J.A. 1110. Despite Mr. McGuffin's dramatic increase in his DWSI rating and positive feedback from ALJ Bowling during the training, Mr. Strong characterized Mr. McGuffin as not having "fared well" during January 2011 and pressed forward with terminating Mr. McGuffin. J.A. 1112. The record is clear that SSA closed the door on Mr. McGuffin well before the end of his first year to avoid the inconvenience of defending itself should Mr. McGuffin assert his procedural safeguards afforded under the CSRA. For these reasons, substantial evidence supports only one conclusion: Mr. McGuffin's preference-eligible veteran status was a substantial factor in SSA's decision to terminate Mr. McGuffin just four days shy of his one-year anniversary at SSA.

## B.

Having determined that Mr. McGuffin carried his burden under the USERRA inquiry, we now turn to whether SSA carried its burden to prove that it terminated Mr. McGuffin for a valid reason. The Board determined that SSA sufficiently proved that Mr. McGuffin was terminated because he was a "poor" performer who had not demonstrated the "required productivity, timeliness and quality after a year of training." J.A. 22.

The documentary evidence, however, does not support a finding that Mr. McGuffin was a poorly performing new hire attorney advisor. As previously noted, SSA evaluates newly hired attorney advisors like Mr. McGuffin under a limited evaluation plan during the first year. J.A. 480. The record indicates, however, that Mr. Thompson and Mr. Strong instead held Mr. McGuffin to a higher standard of meeting his "fair share," an evaluation element that is applied to attorney advisors only after their first year of employment. The record further indicates that Mr. Thompson and Mr. Strong became fixated on Mr. McGuffin's inability to meet his fair share, having noted this concern multiple

times in Mr. McGuffin's October 2010 evaluation report, as well as raising it with Ms. Bosworth. J.A. 508, 823–24. Mr. Thompson and Mr. Strong knew that this element was not applicable to Mr. McGuffin until his second year, at which point Mr. McGuffin would acquire his CSRA benefits. J.A. 824. Not willing to wait until then, Mr. Thompson and Mr. Strong, with the help of Ms. Bosworth, modified the "engages in new learning" element to implicitly contain a fair share standard. J.A. 510, 514, 823–24. For example, after instructing Mr. Thompson that the fair share standard could not be a basis for Mr. McGuffin's termination, Ms. Bosworth recrafted Mr. McGuffin's draft termination letter by replacing the "fair share" reference with a reference to an inability to independently complete his work, a sub-element to the "engages in new learning" element. J.A. 510, 514.

Disregarding the improper references to Mr. McGuffin's inability to meet his fair share and other numeric data, the agency's evaluation report for October 2010 indicates that Mr. McGuffin successfully met the limited two element evaluation standard for new hires. J.A. 500–01. Furthermore, despite SSA's argument that the "quality" of Mr. McGuffin's work was lacking, Mr. Thompson testified at Mr. McGuffin's EEOC hearing that Mr. McGuffin had to re-write a decision on only two occasions throughout his first year at SSA. J.A. 408. Additionally, these two occasions occurred in late December 2010 and January 2011, well after Mr. Thompson had already decided in early November 2010 that Mr. McGuffin should be fired instead of being trained. Mr. Thompson further testified at that same EEOC hearing that it was "not uncommon" for an ALJ to be "unhappy with a decision" drafted by an attorney advisor and to require edits to that decision. J.A. 407–08, 413. In addition, the record indicates that Mr. McGuffin received positive feedback from various ALJs about the quality of his work. This evidence demonstrates that Mr. McGuffin was not performing poorly, let alone so poorly as

to justify the agency's rush to remove him four days before his one-year mark. For these reasons, SSA's purported reason for terminating Mr. McGuffin—his poor performance—is inconsistent with the documentary evidence, which points to only one reasonable motive: SSA rushed to terminate Mr. McGuffin four days before he completed his first year at the agency solely to prevent him from obtaining CSRA benefits.

The Board determined that, based on the testimony of Mr. Strong, Mr. Thompson, and ALJ McGraw, SSA sufficiently proved that Mr. McGuffin was validly terminated due to his poor performance. The Board noted that Mr. McGuffin's supervisors "credibl[y]" testified that they would have terminated any employee who was performing as poorly as Mr. McGuffin "after almost a year of training." J.A. 22. The testimony relied on by the Board, however, is undermined by the documentary evidence reviewed above and, thus, the Board erred by not giving due weight to this evidence. The Board may not insulate its findings from review by denominating them credibility determinations when "documents or objective evidence may contradict the witness' story." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *see also Jones v. Dep't of Health & Human Servs.*, 834 F.3d 1361, 1368 (Fed. Cir. 2016).

In sum, as noted above, the preference-eligible veteran must satisfy his statutory burden. If met, then the burden shifts to the employer, who must show a "valid" reason for terminating a preference-eligible veteran within his probationary period to not run afoul of USERRA. *Sheehan*, 240 F.3d at 1013. SSA's improper evaluation of Mr. McGuffin based on the fair share standard, SSA's delay in providing Mr. McGuffin with adequate training, and its disregard of the positive results of that training in January 2011 do not support Mr. Strong's self-serving and incorrect statement that the agency "bent over backwards to try to be fair," or a conclusion that SSA was honestly dissatisfied with Mr.

McGuffin's performance. J.A. 247. Instead, the record indicates that SSA was honestly concerned with the administrative burden of defending itself should Mr. McGuffin assert his CSRA procedural safeguards. For these reasons, substantial evidence does not support a finding that SSA terminated Mr. McGuffin *when it did* for poor performance. To be clear, USERRA allows for termination of veterans within their first year of employment so long as the employer's reason for termination is valid. Based on the circumstances of this case, however, substantial evidence does not support such a conclusion. SSA's discriminatory treatment of Mr. McGuffin violates USERRA's objective of protecting veterans from being disadvantaged in the workplace by virtue of their military service, and, thus, cannot stand. *See Erickson*, 571 F.3d at 1368.

## IV. CONCLUSION

We have considered all of SSA's remaining arguments and find them unpersuasive. For the foregoing reasons, we reverse the Board's decision that USERRA was not violated, and remand for determination of an appropriate remedy.

### REVERSED AND REMANDED

#### COSTS

Costs to Mr. McGuffin.