# United States Court of Appeals for the Federal Circuit

---

**FERNANDO SANTOS,**
*Petitioner*

**v.**

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION,**
*Respondent*

---

2019-2345

---

Petition for review of the Merit Systems Protection Board in No. AT-0432-19-0074-I-1.

---

Decided: March 11, 2021

---

FERNANDO SANTOS, Orlando, FL, pro se.

ROBERT R. KIEPURA, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by DEBORAH ANN BYNUM, JEFFREY B. CLARK, ROBERT EDWARD KIRSCHMAN, JR.; TREVOR OKTAY TEZEL, Office of the Chief Counsel, NASA Kennedy Space Center, Kennedy Space Center, FL.

DEBRA LYNN ROTH, Shaw, Bransford & Roth P.C., Washington, DC, as amicus curiae counsel. CONOR DIRKS, JAMES GARAY HEELAN also appearing.

————————————

Before O'MALLEY, BRYSON, and HUGHES, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* O'MALLEY.

Concurring opinion filed by *Circuit Judge* Hughes.

O'MALLEY, *Circuit Judge.*

In 2018, Fernando Santos—a mechanical engineer for National Aeronautics and Space Administration ("NASA") and a commander in the United States Navy Reserve—was transferred to a new division of NASA and placed under the supervision of Angela Balles, chief of the Ground Systems Branch of the Commercial Division. Despite working at NASA for over 18 years and receiving multiple accolades for his service, Santos began receiving letters of instruction and reprimand under his new supervisor alleging deficient performance. Although Balles maintained that she had no problems with Santos's mandatory military obligations, the timing of many letters coincided with Santos's requests for or absences due to military leave. The letters, moreover, made much of Santos's ability to "report to work in a timely manner and maintain regular attendance at work." After months of difficulties, Balles formally placed Santos on a performance improvement plan ("PIP"). On August 27, 2018, Balles issued Santos a notice of proposed removal. Santos was removed from his position on September 26, 2018.

On October 26, 2018, Santos appealed his removal to the Merit Systems Protection Board ("Board"). *Santos v. Nat'l Aeronautics & Space Admin*, No. AT-0432-19-0074-I-1, 2019 WL 2176543 (M.S.P.B. May 21, 2019). The administrative judge ("AJ") issued an initial decision upholding NASA's removal and rejecting Santos's

claim under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). *Id.* The AJ's initial decision became the Board's final decision because Santos did not petition the Board for review. Santos appeals. Because the Board applied the wrong legal framework when assessing Santos's removal and did not adequately analyze his USERRA claim, we vacate and remand.

## I. BACKGROUND

Santos's affiliation with NASA started in 1997. Although he began his career as a prime contractor supporting the space shuttle division, NASA hired Santos three years later. *Santos*, 2019 WL 2176543, at *2. Santos then served as the lead engineer on various projects, including the OV-105 Endeavor, OV-104 Atlantis, and OV-103 Discovery. For seventeen years, NASA recognized Santos's efforts. Santos, for example, was an Engineering Employee of the Month, received the NASA Honor Award and the Space Shuttle Program Manager Commendation, and accepted the Silver Snoopy Award—an award given to less than 1% of the entire NASA and contractor workforce. From 2011 through 2017, Santos received ratings of Fully Successful (3), Accomplished (4), and Distinguished (5) on his performance evaluations.

In early 2017, Santos joined the newly created Ground Systems Branch in the Commercial Systems Division of the Engineering Directorate. As a mechanical engineer in the Ground Systems Branch, Santos's supervisor was Balles.

In addition to his work with NASA, Santos was a commander in the United States Navy Reserve with over twenty years of service as an engineering duty officer. As a senior officer in the Navy, Santos commanded two units, SurgeMain San Antonio and SurgeMain Little Rock, wherein he managed a team charged with supporting warship modifications and maintenance. He also served as the officer-in-charge for Space and Naval Warfare and regularly led cybersecurity trainings. To fulfill these

obligations, Santos regularly took military leave from NASA, sometimes for as long as eight weeks.

Before the Board, Santos testified that, although he "had never had problems with his use of military leave previously, he noticed as the year progressed that Balles was routinely taking a longer amount of time to approve his use of military leave." He also testified that he was often held accountable for meetings missed due to his military obligations, even though those meetings were scheduled after he had submitted notice of military leave. In November 2017, for example, Santos notified Balles that he would be out on military leave from November 5, 2017 through November 19, 2017. Upon his return, Santos alleged that Balles instructed him to develop a report that required knowledge of what was discussed during a meeting that took place while he was on leave. Although Santos eventually obtained a copy of the meeting minutes and submitted the report, Balles informed Santos that the report was unsatisfactory and asked another employee to redo Santos's work. Additionally, on February 13, 2018—one day after Balles had officially approved another request for Santos's military leave—Balles issued a Letter of Instruction providing "explicit instructions concerning [Santos's] use of leave, [] work schedule, and the recording of [] hours at work."

According to Santos, this cycle repeated itself for the next few months: Balles would assign Santos a task that coincided with his military duty; Santos would be unable to complete the task due to his concurrent military obligations; and Balles would reprimand Santos for failing to complete the task to a satisfactory level. Santos also alleged that, when he expressed concerns about projects that would be due during his upcoming military leave, Balles responded that it was "his responsibility to figure out how to have everything covered." And, Santos noted that Balles issued him a Letter of Reprimand for a training that had

lapsed while he was out on military duty, but which he completed two days after returning from leave.

On May 31, 2018, Balles placed Santos on a PIP for 45 days and assigned him eleven deliverable assignments. Throughout this period, Balles met with Santos to discuss his progress and give him feedback on his work product. Because Santos's military leave overlapped with the last two days of this probationary period, Balles allowed Santos to make certain edits on the written assignments and to schedule presentations after the PIP period expired. Balles ultimately determined that Santos's deliverables were unsatisfactory and proposed his removal based on a charge of unacceptable performance. Accordingly, Santos was removed from his position on September 26, 2018.

Santos appealed his removal, arguing (*inter alia*) that it was retaliatory and violated USERRA. The Board affirmed. *See Santos*, 2019 WL 2176543. Pursuant to 5 U.S.C. § 43, the Board considered whether NASA proved by substantial evidence that: (1) Santos's performance failed to meet the PIP-established performance standards in one or more critical elements of his position; (2) NASA established performance standards and critical elements and communicated them to Santos at the beginning of the PIP; (3) NASA warned Santos of the inadequacies of his performance during the PIP and gave him adequate opportunity to improve; and (4) after an adequate improvement period, Santos's performance remained unacceptable in at least one critical element. *Id.* at *3. After considering the evidence related to Santos's performance during the PIP, the Board concluded that NASA had "established by substantial evidence each of the elements necessary to have its decision to remove [Santos] using chapter 43 procedures sustained by the Board." *Id.* at *11. Notably, the Board did not address Santos's argument that he should not have been put on a PIP in the first place; the Board justified this decision by citing *Wright v. Department of Labor*, No. CH-0432-98-0134-I-1, 1999 WL 316948, at ¶ 12 (M.S.P.B.

May 12, 1999), in which the Board held that "an agency is not required to prove that an appellant was performing unacceptably prior to the PIP." *Santos*, 2019 WL 2176543, at \*5.

The Board also rejected Santos's USERRA claim, holding that Santos failed to show that his uniformed service was a substantial or motivating factor in his removal. *Id.* at \*11–12. In reaching this conclusion, the Board concluded that there was no evidence supporting Santos's claim because Balles "thanked him for his service," was "very patriotic," and did not express to others that Santos took too much military leave. *Id.* at \*12.

Santos appealed the Board's decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## II. DISCUSSION

This court holds unlawful and sets aside any agency action, findings, or conclusions found to be "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence."    5 U.S.C. § 7703(c). The Board abuses its discretion when "its decision (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) follows from a record that contains no evidence on which the [Board] could rationally base its decision." *Mayers v. Merit Sys. Prot. Bd.*, 693 F. App'x 902, 903 (Fed. Cir. 2017) (citing *Sterling Fed. Sys., Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994)). We review the Board's underlying factual determinations for substantial evidence. *McMillan v. Dep't of Justice*, 812 F.3d 1364, 1371 (Fed. Cir. 2016).

Santos argues that the Board's determination was unlawful because (1) the AJ failed to consider the events preceding his PIP when assessing the propriety of his removal;

(2) failed to engage in the correct legal inquiry when assessing his USERRA claim; and (3) predicated its conclusion that his military service was not a primary motivating factor in his removal on inadequate facts. We agree with Santos on each point.

A.

The statute governing post-PIP removals, 5 U.S.C. § 4302, provides that employees "who continue to have unacceptable performance" may only be removed "after an opportunity to demonstrate acceptable performance." 5 U.S.C. § 4302(c)(6). The Board has held that this provision does not require an agency to prove that an employee was performing unacceptably prior to the PIP in order to justify a post-PIP removal. *See Wilson v. Dep't of Navy*, 24 M.S.P.R. 583, 586 (1984) (finding "no statutory or regulatory basis" to require an agency to establish appellant's unsatisfactory performance prior to the PIP[1]). The Board has consistently applied this interpretation to PIP removals. *See, e.g.*, *Brown v. Veterans Admin.*, 44 M.S.P.R. 635, 640 (1990) ("[I]f the employee's performance is unacceptable during the PIP, the agency may generally base an action on this deficiency and need not also show that the employee's performance was unacceptable prior to the PIP, as the Board held in *Wilson* . . . .").

We have not directly addressed the question of whether, when an agency predicates removal on an employee's failure to satisfy obligations imposed by a PIP and that removal is challenged, the agency must justify imposition of a PIP in the first instance under 5 U.S.C. § 4302,

---

[1] The *Wilson* Board interpreted 5 U.S.C. § 4302(b)(6), a prior version of 5 U.S.C. § 4302(c)(6). Because the amended version predates the adverse employment action at issue here, this opinion refers to the more recent codification.

though we have discussed the general relevance of pre-PIP performance to a PIP removal. *See Harris v. Sec. & Exch. Comm'n*, 972 F.3d 1307, 1316–17 (Fed. Cir. 2020). Today we confirm that the statute's plain language demonstrates that an agency must justify institution of a PIP when an employee challenges a PIP-based removal.

Section 4302 requires agencies to develop a performance appraisal system that, *inter alia*, "provide[s] for periodic appraisals of job performance of employees." 5 U.S.C. § 4302(a)(1). Section 4302(c) contains six subsections that detail what must comprise an agency's performance appraisal system. Subsections (c)(5) and (c)(6) advise how an agency's performance appraisal system should handle "unacceptable performance." An agency's performance appraisal system should provide for "assisting employees in improving unacceptable performance," 5 U.S.C. § 4302(c)(5), as well as "reassigning, reducing in grade, or removing employees *who continue to have unacceptable performance* but only after an opportunity to demonstrate acceptable performance," 5 U.S.C. § 4302(c)(6) (emphasis added). Agencies usually provide employees "an opportunity to demonstrate acceptable performance" by placing them on a PIP. *See Harris*, 972 F.3d at 1311.

Thus, Section 4302(c)(6) makes clear that an agency is only allowed to "reassign[], reduc[e] in grade, or remov[e] employees who *continue to* have unacceptable performance" during a PIP. 5 U.S.C. § 4302(c)(6) (emphasis added). To "*continue to* have unacceptable performance" during the PIP, as the statutory text requires, an employee must have displayed unacceptable performance *prior to* the PIP. Under the plain meaning of the statute, then, an agency must defend a challenged removal by establishing that the employee had unacceptable performance before the PIP and "continue[d] to" do so during the PIP.

The Office of Personnel Management ("OPM"), the agency tasked with implementing the performance appraisal system of Chapter 43, reads Section 4302 the same way. OPM published a regulation entitled "Addressing Unacceptable Performance," which pertains to subsections (c)(5) and (c)(6) of Section 4302. *See* 5 C.F.R. § 432.104. OPM published a notice of final rulemaking on October 16, 2020, amending this regulation to provide:

> At any time during the performance appraisal cycle that an employee's performance is determined to be unacceptable in one or more critical elements, the agency shall notify the employee of the critical element(s) for which performance is unacceptable and inform the employee of the performance requirement(s) or standard(s) that must be attained in order to demonstrate acceptable performance in his or her position.

*Id.* Notably, OPM stated in its notice of final rulemaking that "[t]he amended rule does not relieve agencies of the responsibility to demonstrate that an employee was performing unacceptably – *which per statute covers the period both prior to and during a formal opportunity period* – before initiating an adverse action under chapter 43." Probation on Initial Appointment to a Competitive Position, Performance-Based Reduction in Grade and Removal Actions and Adverse Actions, 85 Fed. Reg. 65940, 65957 (Oct. 16, 2020) (emphasis added). OPM's statement accords with our understanding that Section 4302(c)(6) requires agencies to justify a challenged post-PIP-based removal by establishing the propriety of the PIP in the first instance.

Our holdings in *Harris* and *Lovshin v. Department of Navy*, 767 F.2d 826 (Fed. Cir. 1985) are not inconsistent with this reading of Section 4302. *Lovshin* delineated four requirements agencies must satisfy before removing an underperforming employee under Section 4303. Agencies

must: (a) establish an approved performance appraisal system; (b) communicate the performance standards and critical elements of an employee's position to the employee; (c) warn the employee of inadequacies in "critical elements"; and (d) offer an underperforming employee counseling and an opportunity for improvement. *Lovshin*, 767 F.2d at 834. There, we emphasized that these requirements are consistent with fundamental fairness to employees. *Harris* clarified the third *Lovshin* element, holding that "the PIP notice itself often serves as the warning" of a performance problem. *Harris*, 972 F.3d at 1316.

But, *Harris* also confirmed that pre-PIP performance by the terminated employee and the agency's pre-PIP treatment of the employee may be relevant to the removal inquiry. *See Harris*, 972 F.3d at 1316–1317. While we did not find the pre-PIP evidence in *Harris* sufficient to override the agency's removal decision, we expressly discussed the AJ's consideration of it, concluding that the AJ had adequately done so in that case. *Id.* at 1320–21.

Confirming an agency's obligation to justify initiation of a PIP where the PIP leads to removal is particularly appropriate, moreover, in situations resembling Santos's, where an employee alleges that both the PIP and the removal based on the PIP were in retaliation for protected conduct. Otherwise, an agency could establish a PIP in direct retaliation for protected conduct and set up unreasonable expectations in the PIP in the hopes of predicating removal on them without ever being held accountable for the original retaliatory conduct. Indeed, these are the circumstances in which the issue of pre-PIP performance would be most relevant.

NASA agrees that, pursuant to § 4302(c)(6), "the employee in question must have had unacceptable performance prior to being placed on a PIP." It, thus, appears to agree with Santos that the Board's longstanding practice of ignoring pre-PIP circumstances is erroneous. NASA

maintains, however, that Section 4303 governs the PIP process and is silent on whether agencies bear the burden of establishing the unacceptability of pre-PIP performance where a post-PIP removal is challenged. Section 4303's silence, according to NASA, signals that the burden rests on the "employee to demonstrate that the agency's action was improper." NASA also asserts that, since "an agency is not required [under *Harris*] to even notify an employee of unacceptable performance prior to the issuance of the PIP," "there [must be] no requirement that an agency affirmatively establish unacceptable performance prior to the issuance of the PIP."

NASA's arguments miss the mark. In our July 1, 2020 Order, we directed the parties to brief "whether, pursuant to 5 U.S.C. § 4302(c)(6), an agency must establish that an employee had 'unacceptable performance' *prior* to the implementation of a [PIP]." Order Requesting Supplemental Briefing, No. 19-2345 (July 1, 2020), ECF 31, at 2 (emphasis in original). Instead of discussing Section 4302, NASA analyzes Section 4303, erroneously reasoning that "[w]hether an agency's action in issuing a PIP was proper is governed by Section 4303." But we have made clear that Section 4302 governs the statutory PIP process. *See, e.g.*, *Harris*, 972 F.3d at 1311; *see also Moltzen v. Dep't of Labor*, 504 F. App'x 912, 914 (Fed. Cir. 2013). NASA's argument concerning Section 4303's silence on an agency's burden to prove that an employee's pre-PIP performance was unacceptable ignores the most relevant statutory language—that in Section 4302(c)(6).

NASA's reliance on *Harris* is also misplaced. To be sure, an employee may not seek review of the decision to implement a PIP at the time it is instituted, either at the Board or otherwise. And, as *Harris* makes clear, the institution of the PIP can itself satisfy the notice component of Section 4303, but, when an agency chooses to remove an employee at the end of the PIP period, pre-PIP conduct may be relevant to the removal decision, as *Harris* also

confirms. Allowing a PIP to serve as the pre-removal notice required by Section 4303 is not the same as allowing the mere fact of a PIP to create a presumption that the pre-PIP conduct was *actually* unacceptable. Thus, we hold that, once an agency chooses to impose a post-PIP termination, it must prove by substantial evidence that the employee's unacceptable performance "continued"—i.e., it was unacceptable before the PIP and remained so during the PIP.

Importantly, we are not prescribing any particular evidentiary showing with respect to the employee's pre-PIP performance. Performance failures can be documented or established in any number of ways. The burden would then shift to the employee to prove that the motive for imposing the PIP and, ultimately termination, was discriminatory under well-established guidelines for making such a showing.

Because the Board's decision to not consider Santos's allegation that he should never have been placed on a PIP was based on a misinterpretation of Section 4302(c)(6), we find that the Board abused its discretion. We therefore vacate and remand this issue for the Board to decide whether NASA established that Santos performed unacceptably prior to being placed on the PIP, thus satisfying the "continue[d] to have unacceptable performance" language under 5 U.S.C. § 4302(c)(6).

B.

Santos also argues that, even if some aspects of his performance were unacceptable, his military service was a primary motivating factor in his removal. USERRA "prohibit[s] discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a)(3). The act prohibits an agency from denying any person who has a military obligation "any benefit of employment by an employer on the basis of . . . performance of service." 38 U.S.C. § 4311(a). As we articulated in *Sheehan v. Department of Navy*, 240 F.3d 1009 (Fed. Cir. 2001), "an

employee making a USERRA claim of discrimination . . . bear[s] the initial burden of showing by a preponderance of the evidence that the employee's military service was 'a substantial or motivating factor' in the adverse employment action." *Id.* at 1013. It need not be the only motivating factor, but it must be a substantial one. *Sheehan* establishes four non-exclusive factors that can help the Board determine whether a discriminatory motivation may reasonably be inferred in a USERRA challenge:

> [1] proximity in time between the employee's military activity and the adverse employment action, [2] inconsistencies between the proffered reason and other actions of the employer, [3] an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and [4] disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Id.* at 1014. Once the employee has made the requisite showing, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Id.* at 1013. "[A]n employer [cannot] treat employees on military duty like those on nonmilitary leave of absence." *Erickson v. U.S. Postal Serv.*, 571 F.3d 1364, 1369 (Fed. Cir. 2009) (internal quotation marks omitted).

Because we vacate and remand the Board's conclusions regarding Santos's performance, we must vacate and remand the Board's assessment of Santos's USERRA claim as well. The two inquiries are related since the validity of the reason proffered for a discharge is a factor in the *Sheehan* analysis. The events leading to Santos's PIP may be directly relevant to Santos's ability to satisfy his initial burden under USERRA. We therefore vacate and remand this issue to the Board for additional fact findings

concerning Santos's pre-PIP performance and Ms. Balles's motivations for instituting the PIP.

We make clear, moreover, that, on remand, the Board must actually apply the *Sheehan* factors, which it has not yet done. Santos argued to the Board that "his removal was discriminatory because . . . management held the time he was absent for military service against him." *Santos*, 2019 WL 2176543, at *12. And he detailed the extent to which reprimands or complaints about his performance dovetailed with his requests to fulfill his military obligations. The Board simply concluded that Santos failed to show his military service was a substantial or motivating factor in his removal because Balles "thanked [Santos] for his service" and was "very patriotic." *Id.* Those minimal factual findings do not suffice under *Sheehan*. On remand, the Board must apply the *Sheehan* factors to all the facts concerning Santos's performance and Balles's supervision of Santos, both pre- and post-PIP.[2]

### III. CONCLUSION

For the reasons discussed above, we conclude that the Board's decisions were not in accordance with the law. We therefore vacate and remand for further proceedings consistent with this decision.

**VACATED AND REMANDED**

COSTS

Costs to petitioner.

---

[2] The Board must consider, *inter alia*, Santos's allegations that the timing of his letters of reprimand, the PIP itself, and the nature of the PIP requirements are relevant to his USERRA claim.

# United States Court of Appeals
# for the Federal Circuit

---

**FERNANDO SANTOS,**
*Petitioner*

**v.**

**NATIONAL AERONAUTICS AND SPACE ADMINISTRATION,**
*Respondent*

---

2019-2345

---

Petition for review of the Merit Systems Protection Board in No. AT-0432-19-0074-I-1.

---

HUGHES, *Circuit Judge*, concurring in the judgment.

The Board failed to properly consider Mr. Santos's claims pursuant to USERRA, including his claim that the agency's decision to place him on a PIP in the first place was due to unlawful retaliation or discrimination prohibited by USERRA. I agree that the case should be remanded. Accordingly, I concur in the judgment.